T.C. Memo. 1998-398

UNITED STATES TAX COURT

BENJAMIN B. AND DORINA MICORESCU, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 24964-96.                    Filed November 10, 1998.

Douglas G. Miller, for petitioners.

Ann M. Murphy, for respondent.


MEMORANDUM OPINION

DEAN, Special Trial Judge:  This case was heard pursuant to section 7443A(b)(3) and Rules 180, 181, and 182.[1]  Respondent determined deficiencies in petitioners' Federal income taxes for

_____

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

the years 1992, 1993, and 1994 in the amounts of $2,222, $4,392, and $5,906, respectively.

After concessions by the parties,[2] the issues for decision are: (1) Whether petitioners are entitled to exclude from income the receipt of certain payments for adult foster home care; and (2) whether adult foster home care business expenses were correctly allocated by respondent to nonexempt adult foster home care income.

Many of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by reference. Petitioners resided in Portland, Oregon, at the time they filed their petition in this case.

### Background

During the years 1992, 1993, and 1994, petitioners were in the trade or business of providing adult foster home care for individuals in Portland, Oregon.

Petitioners were licensed by the Multnomah County Aging Services Division (ASD) as Level III adult foster home providers and were subject to Multnomah County Administrative Rules. ASD is an instrumentality of the State of Oregon that acts as a

---

[2]The parties agree on the amount of "other expenses" that is deductible by petitioners. The parties agree that certain of petitioners' claimed expenses related to their adult foster home are subject to the rules of sec. 280A.

social service agency responsible for providing various services to individuals including determining eligibility for, and case management in, medicaid[3] for elderly persons.

The State of Oregon has applied for and received "waivers" from the Federal Health Care Financing Administration that allow it to use medicaid funds intended for nursing facility care, to provide community-based care services to nursing facility eligible individuals.

The State of Oregon provides health care for elderly medicaid-eligible individuals, including long-term adult foster care services. The State also contracts with health care providers to supply a variety of necessary services, including adult foster care. During the years at issue, ASD was a party to an Interagency Partnership Agreement (partnership agreement) with Providence ElderPlace, A Division of Shared Services of the Sisters of Providence (ElderPlace).

ElderPlace is not an agency of a State or of a political subdivision of a State. It is a State of Oregon medicaid service

---

[3]Medicaid is a State-administered program jointly funded by State and Federal Governments under tit. XIX of the Social Security Act Amendments of 1965 (SSA), Pub. L. 89-97, sec. 122, 79 Stat. 286, 343, current version at 42 U.S.C. secs. 1396-1396v (1994). It provides medical assistance for certain low-income people who meet specific eligibility criteria.

Medicare is Federal health insurance for the aged and disabled under tit. XVIII of the SSA, secs. 1801-1815, 79 Stat. 291-297, current version at 42 U.S.C. secs. 1395-1395ggg (1994 & Supp. III 1997).

provider, a section 501(c)(3) health maintenance organization providing long-term care to the elderly funded through medicaid and medicare payments. ElderPlace is part of a demonstration project the purpose of which is to determine whether a private concern can provide the same services as medicaid and medicare at less cost in Government funds.[4] Although about 94 percent of ElderPlace enrollees are medicaid eligible, ElderPlace also has clients who are not medicaid eligible and clients who are not referred by the State.

Under the partnership agreement, ASD and ElderPlace "[work] together to address the needs of older adults in Multnomah County."

The partnership agreement provides that persons who elect to participate in the ElderPlace program must agree to receive all their health and long-term care services exclusively from

---

[4]The ElderPlace program operates under provisions that allow States at their option to seek a Federal waiver of certain medicaid and medicare requirements in order to underwrite adult foster home care at a rate cheaper than that for the institutional care that they would otherwise need. The provisions had their inception with the "On LOK" program. See Social Security Amendments of 1983, Pub. L. 98-21, sec. 603(c), 97 Stat. 65, 168, amended by: (a) Consolidated Omnibus Budget Reconciliation Act of 1985, Pub. L. 99-272, sec. 9220, 100 Stat. 82, 183; (b) Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-509, sec. 9412(b), 100 Stat. 1874, 2063; (c) Omnibus Budget Reconciliation Act of 1987, Pub. L. 100-203, sec. 4118(b), (g), 101 Stat. 1330, 1330-155 and 1330-156; and (d) Balanced Budget Act of 1997, Pub. L. 105-33, sec. 4801, 111 Stat. 251, 528, codified at 42 U.S.C. sec. 1395eee (1994 & Supp. III 1997) as the Programs of All-Inclusive Care for the Elderly (PACE).

ElderPlace. ElderPlace assumes the full cost for all services provided. In return, ElderPlace receives a payment monthly from medicare and medicaid for providing the full range of medical, social, and long-term care services that the participants need. The amount of such payments is based on the number of participants served.

Under the partnership agreement, ASD retains responsibility for "screening and intake" of elderly individuals. As part of its screening and intake of older adults for long-term care services, ASD agrees to "consider ElderPlace as one of the options available to the older adult." ASD will continue to determine eligibility for medicaid services and will screen persons for medicaid-waivered services to determine whether they are eligible for the ElderPlace program. Under the partnership agreement, ASD also remains responsible for "protective services" (protecting the elderly against abuse, neglect, exploitation, and abandonment).

But for the above-named purposes, individuals choosing to enroll in the ElderPlace program are removed from the ASD case management system and put into the ElderPlace system. ElderPlace case management activities include developing a "care plan" for the enrollee that takes into consideration the enrollee's need of transportation, medical equipment, supplies, medications, and therapies.

The State of Oregon and ElderPlace entered into a series of contracts between 1990 and 1994 in order to carry out the objectives of the partnership agreement.

Pursuant to the contracts with the State of Oregon, ElderPlace provided health services and, to those in need, personal services like assistance with bathing, grooming, and eating.  These services were supplied through adult foster care home providers, such as petitioners, with whom ElderPlace contracted in turn.  ElderPlace paid adult foster care home operators out of the funds paid to it by the State of Oregon.

Adult foster home operators who elected to care for residents enrolled in the ElderPlace program received payments negotiated separately with each homeowner, based on the level of service each would provide.  ElderPlace did not, however, pay for room and board at adult foster homes.  Room and board payments were the responsibility of the enrollee or the enrollee's representative and were paid at a rate determined by a schedule set by the State of Oregon.

If an elderly person chose to enroll in the ElderPlace program, and foster care was appropriate, ElderPlace assisted in "locating adult foster care homes that have the capacity to meet their care needs and also have vacancies".  ElderPlace supplied transportation to the enrollee or his representative to look at different foster homes.  ElderPlace advised the enrollee or his

representative as to whether one foster home would be better than another for the particular enrollee, based upon that enrollee's needs. Once a decision was made identifying the foster home in which the enrollee wanted to live, ElderPlace negotiated the enrollee's payment rate with the foster home operator of the selected home.

During each of the years 1992, 1993, and 1994, petitioners provided adult foster care to several persons in their home. All of the residents had attained the age of 19. Petitioners received adult foster care payments for the individuals from various sources, from their residents or their representatives, in some cases from the State of Oregon and in other cases from ElderPlace.

On their Federal income tax returns for 1992 through 1994, petitioners reported certain income and deductions from "ADULT FOSTER CARE" on Schedule C. Petitioners did not report as income amounts received from the State of Oregon or from ElderPlace. On their return for 1994, petitioners reported exclusions of State and ElderPlace payments from income and made a separate adjustment for expenses attributable to nontaxable income.

Respondent examined petitioners' returns and determined that petitioners improperly excluded self-employment income received from ElderPlace in the amounts of $13,167, $22,750, and $32,366 for the years 1992, 1993, and 1994, respectively, and are

entitled to claim additional business expenses associated with the income that was allocated under section 265.

## Discussion

The parties agree that payments petitioners received directly from residents, or their representatives, are taxable and that payments petitioners received for residents placed in their home directly by the State of Oregon are tax exempt under section 131. The parties disagree about whether payments petitioners received from ElderPlace are exempt from tax under section 131 and the proper allocation of expenses to exempt and nonexempt income under section 265.

### Section 131 Foster Care Payments

Section 131(a) provides that gross income shall not include "qualified foster care payments". A "qualified foster care payment" as described in section 131(b)(1) is any amount:

> (A) which is paid by a State or political subdivision thereof or by a placement agency which is described in section 501(c)(3) and exempt from tax under section 501(a), and
>
> (B) which is--
>
>> (i) paid to the foster care provider for caring for a qualified foster individual in the foster care provider's home, or
>>
>> (ii) a difficulty of care payment.[5]

---

[5]Difficulty of care payments as described in sec. 131(c) are not at issue in this case.

A "qualified foster individual" is described in section 131(b)(2) as any individual living in a foster family home in which the individual was "placed by":

> (A) an agency of a State or political subdivision thereof, or

> (B) in the case of an individual who has not attained age 19, an organization which is licensed by a State (or political subdivision thereof) as a placement agency and which is described in section 501(c)(3) and exempt from tax under section 501(a).

Petitioners argue that the payments to them by ElderPlace are excluded from income under section 131 because they are qualified foster care payments. Even "though the check to the petitioners is made by Providence ElderPlace", petitioners contend that the payments, indirectly, are from the State of Oregon. Petitioners argue further that the legislative history of section 131 and the intent of Congress in enacting it was that a payment by an "intermediary" such as ElderPlace, made out of State funds "that a state has an obligation to provide", meets the requirements of section 131(b)(1)(A).

Respondent contends that the ElderPlace payments to petitioners are includable in gross income because the payments are not qualified foster care payments. They are not qualified foster care payments, maintains respondent, because the ElderPlace payments were not paid to petitioners for caring for "qualified foster [individuals]". Respondent points to the definition of a qualified foster individual in section 131(b)(2)

as an individual living in a foster family home who was "placed [there] by" an agency of a State or political subdivision thereof.  Since ElderPlace, not an agency of a State or political subdivision thereof, "placed" its enrollees with petitioners, the enrollees are not qualified foster individuals, argues respondent.  Respondent concludes that the ElderPlace payments to petitioners do not meet the stated requirements.

Qualified Foster Individual

The amounts in question can be qualified foster care payments only if they were paid to petitioners as foster care providers for qualified foster individuals.  Sec. 131(b)(1)(B)(i); see supra note 5.  Therefore, the focus of our analysis will be to decide whether ElderPlace enrollees in petitioners' home were qualified foster individuals.

To be a qualified foster individual, an individual in a foster home who has attained age 19 must have been "placed by" an agency of a State or political subdivision thereof.  Sec. 131(b)(2)(A).  If ElderPlace enrollees were not "placed by" an agency of a State or political subdivision thereof into petitioners' foster home, they are not qualified foster individuals.

"Placed by" a State Agency

Petitioners deny that ElderPlace enrollees were "placed by" ElderPlace in their care.  According to petitioners, none of the

witnesses at trial gave any testimony that the ElderPlace program "placed" individuals in foster homes.

Petitioners further contend that the phrase "placed by" in section 131(b)(2) has no definition in the Internal Revenue Code or regulations, no legal definition in case law, and no definition in Oregon State statutes, administrative rules, or local county rules or ordinances.  The words "place" or "placement" have, petitioners allege, no "customary meaning to those who are closely involved in adult foster care."

Without a working definition of the word, petitioners nonetheless argue that the elderly enrollees of the ElderPlace program were "placed" in their care, not by ElderPlace, but by the "actions" of a government agency, albeit indirectly. Petitioners urge us to examine the legislative history of section 131 to confirm their view.

Respondent replies that to be a "qualified foster individual", the plain language of section 131(b)(2) requires that individuals who have attained the age of 19 must be "placed by" an agency of a State or political subdivision thereof.  Since ElderPlace, and not an agency of the State or political subdivision thereof, "placed", in the common usage of the term, its enrollees with petitioners, respondent maintains that the requirements of section 131(b)(2) were not met in petitioners' case.

Plain Meaning

The starting point for the interpretation of a statute is the language itself.  Consumer Prod. Safety Commn. v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980); Dyer v. United States, 832 F.2d 1062, 1066 (9th Cir. 1987).  If the language of the statute is plain, clear, and unambiguous, "'the sole function of the courts is to enforce it according to its terms.'"  United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989) (quoting Caminetti v. United States, 242 U.S. 470, 485 (1917)).

The Court must assume that the legislative purpose of the statute is expressed in the ordinary meaning of the words used.  American Tobacco Co. v. Patterson, 456 U.S. 63, 68 (1982); Richards v. United States, 369 U.S. 1, 9 (1962); Florida Hosp. Trust Fund v. Commissioner, 103 T.C. 140, 152 (1994), affd. 71 F.3d 808 (11th Cir. 1996).  Where there is a conflict in inferences between the language of the statute and the legislative history, the language of the statute generally prevails.  In re Stringer, 847 F.2d 549, 551 (9th Cir. 1988); Huntsberry v. Commissioner, 83 T.C. 742, 747-748 (1984).

The common meaning of the verb "to place" is:

1: to distribute in an orderly manner: ARRANGE  2 a: to put in or as if in a particular place: SET  b: to present for consideration (a question placed before the group) c: to put in a particular state (~ a performer under contract) d: to direct to a desired spot * * * 4: to find a place (as a home or employment) for * * * * [Webster's Ninth New Collegiate Dictionary 897 (1990).]

Examining the record in light of the common meaning of the verb "to place", we find that ElderPlace indeed placed elderly individuals in petitioners' foster home.

Petitioners called as a witness Mr. Donald M. Keister, director of ElderPlace and former deputy director of ASD. Mr. Keister testified that an individual who decided to enroll in the ElderPlace program would undergo an "assessment" to determine his or her needs. ElderPlace, for appropriate individuals, would then assist in locating adult foster homes, provide transportation to view the homes, provide advice as to which home might be best for the individual, and negotiate with the foster home a price to be paid for the care of the individual. On the basis of the latter fact, we assume that if a rate satisfactory to ElderPlace could not be negotiated, another home would be located or the individual would terminate enrollment in the ElderPlace program and attempt to be "placed" by the State.

In cross-examination, respondent's counsel asked whether ElderPlace enrollees might ask to move from one foster home to another, and Mr. Keister replied that such a situation may arise for a number of reasons. He continued to explain:

> So, in essence, when that happens, we go through the same process that I described before.
>
> Placements--you know, movement also occurs through, you know, residential care facilities, they also occur to nursing facilities, depending upon what the care needs of the individual are.

Respondent called Mr. Jeffrey Miller to testify. Mr. Miller is employed by the State of Oregon as a medicaid policy analyst for the State Senior and Disabled Services Division. His position involves helping State field offices determine medicaid eligibility for individuals. Mr. Miller is familiar with the ElderPlace program. During his testimony the following exchange took place:

> Q    To your knowledge, if a person chooses the ElderPlace waiver --
>
> A    Uh-huh.
>
> Q    -- is the State ever consulted as to where that person resides, in what adult foster care home?
>
> A    We would have taken an application on that individual, and in such, we would have had the address of the person.
>
> Q    Okay. But does the State at that point decide--if someone is enrolled in ElderPlace, does the State decide where that person resides?
>
> A    No. The case management responsibilities would be with ElderPlace to do that.
>
> Q    Okay. So ElderPlace would be the placing agency, is that correct?
>
> A    They would be the ones making that decision.

There is additional evidence in the record on the issue of placement. During the years at issue, ElderPlace had a form "Adult Foster Care Contract" (contract) that it used to retain the services of adult foster home care providers. ElderPlace and petitioners used the contract for every ElderPlace program

participant who was referred to petitioners in 1992, 1993, and 1994.  Part III of the contract, Compensation and Billing, states that the "Provider" (petitioners) agrees to accept as full compensation the amounts set forth in an attached exhibit to the agreement.  It is also agreed that "Each Participant placed with the Provider shall have his/her rate based on his/her individual Service Plan".[6]  In part VIII of the agreement, Term and Termination, the parties agree that the "placement" may be terminated by either the Participant, the Provider, or ElderPlace upon 2 weeks' notice.  "After the first two weeks of the Participant's placement," the service plan may be terminated by the Provider under circumstances enumerated in the agreement.  No agency of the State or a political subdivision thereof was a party to the contract between ElderPlace and petitioners.

---

[6]Under the contract, a "Participant" is defined as a person enrolled in the ElderPlace program.  The term "Service Plan" is defined as the plan determined for "each Participant placed with the Provider."  (Emphasis added.)

<u>Legislative History</u>

Petitioners insist, however, that individuals placed by ElderPlace were placed by an entity that had contracted with a State agency responsible for such matters. Therefore, the individuals placed by ElderPlace were placed by the State within the meaning of section 131(b)(2), petitioners conclude. They base their argument on the legislative history of section 131, which, they claim, shows that the use of the phrase "placed by" in section 131(b)(2) merely requires some indirect "State action" of a government agency.

For taxable years beginning before January 1, 1986, section 131 provided an exclusion from gross income for certain payments received by "foster parents" for caring for foster children. The Tax Reform Act of 1986, Pub. L. 99-514, section 1707, 100 Stat. 2085, 2781-2782, amended section 131 to extend to certain adult foster care payments the exclusion from gross income. Petitioners point to the language of H. Conf. Rept. 99-841 (Vol. II), at II-838 through II-839 (1986), 1986-3 C.B. (Vol. 4) 1, 838-839, which says:

> The conferees intend that this extension of the
> exclusion to adult foster care is limited to cases of
> individuals who provide foster care within their own
> homes to adults who have been placed in their care by
> an agency of the State or political subdivision thereof
> specifically designated as responsible for such
> function. The exclusion does not apply to payments to
> operators of boarding homes who provide room and board
> to adults who have not been placed in their care

through the actions of a governmental agency
responsible for adult foster care.

Petitioners focus on the second sentence of the quoted language,
specifically that part that says "through the actions of a
governmental agency responsible for adult foster care."
(Emphasis added.)  Because the second sentence does not say "by
an agency of the State or political subdivision thereof",
petitioners conclude that "State action" includes their
situation, an indirect, contractual relationship with the State
through the entity with which they contracted.

Petitioners fail, however, to address the first sentence of
the above excerpt that expresses the intent of Congress that
section 131 apply only in the case of "adults who have been
placed in their care by an agency of the State or political
subdivision thereof specifically designated as responsible for
such function."  (Emphasis added.)  What petitioners want is to
interpret one sentence out of context.  But words and phrases
must be interpreted in context.  Rules of statutory construction
appropriate to interpreting the language at issue suggest that
words are understood by the words associated with them and that a
general term following specific terms takes its meaning from the
kinds of things denoted by the specific terms.  Jarecki v. G.D.
Searle & Co., 367 U.S. 303, 307 (1961); F.W. Fitch Co. v. United
States, 323 U.S. 582, 585-586 (1945); United States v. Lacy, 119
F.3d 742, 748 (9th Cir. 1997).

We interpret the phrase "State action" in the second sentence of the above excerpt to refer to the intent of the first sentence that adults must have been "placed by" a State agency specifically designated as responsible for that function.

Our interpretation is further reinforced by referring to section 131(b)(2).  A qualified foster individual is not only one placed by "an agency of a State or political subdivision thereof" but may be one also placed by:

> (B) in the case of an individual who has not attained age 19, an organization which is licensed by a State (or political subdivision thereof) as a placement agency and which is described in section 501(c)(3) and exempt from tax under section 501(a).  [Sec. 131(b)(2)(B).]

If Congress had intended the phrase "[placed by] an agency of a State or political subdivision thereof" contained in section 131(b)(2)(A) to include section 501(c)(3) entities such as ElderPlace, it could have used language similar to that used in section 131(b)(2)(B).

Petitioners counter with the argument that section 131(b)(2)(B) operates to exclude section 501(c)(3) organizations from the benefit of section 131 where "there is no state involvement"; that is, where the section 501(c)(3) organization does not receive State funds.  While we are not sure how this bolsters their position, we note that the Court has already observed that petitioners' interpretation of section 131(b)(2)(B) is unsupported.  See Cato v. Commissioner, 99 T.C. 633, 643

(1992), where the Court said: "There is no indication in any of the House or Senate hearings on the bill or in the reports of either congressional branch that would indicate that a distinction should be made that section 131 only applies if a tax-exempt agency is State funded."

We find that the intent of Congress as expressed in the pertinent legislative history comports with the plain meaning of the language in section 131. The record in this case makes it clear that enrollees in the ElderPlace program who were in petitioners' foster home were "placed by" ElderPlace in the home according to the ordinary use and plain meaning of the verb "to place".

The individuals placed in petitioners' home by ElderPlace were not qualified foster individuals because they were not placed by an agency of the State or a political subdivision thereof. Because the ElderPlace enrollees were not qualified foster individuals, amounts paid to petitioners for providing care for them cannot be qualified foster care payments.

Medicaid Policy

Petitioners further argue that a finding by the Court that section 131 does not cover their payments from ElderPlace would produce "absurd results" and that the future of this experimental program would be imperiled. The example of "absurd results" cited by petitioners is the case where a foster home resident

elects in and out of the ElderPlace program, thereby rendering payments to the foster care provider taxable, or nontaxable, depending only upon who is making the payment, the State or ElderPlace.

Petitioners' analysis leads them to an incorrect conclusion. In the situation where an individual eligible for adult foster home care elects in and then out of the ElderPlace program, the placement by ElderPlace is terminated, with notice to the provider according to the contract.  If the State assumes responsibility for care of the individual, the State will then place the individual; it is placement, not payment, that would determine the taxability of the payments in petitioners' example. We find the example cited by petitioners not to be "absurd" but merely the intended result of the statute as written by Congress. See Tele-Communications, Inc. & Subs. v. Commissioner, 95 T.C. 495, 507 (1990), affd. 12 F.3d 1005 (10th Cir. 1993).

Although petitioners assert that tax consequences may negatively affect the medicaid waiver or PACE program by placing an additional financial burden on ElderPlace and petitioners, or those similarly situated, we are not at liberty to ignore the plain wording of section 131.  The purpose of medicaid is not to financially benefit health care providers but to aid patients. Baptist Hosp. E. v. Secretary of HHS, 802 F.2d 860, 868-869

(6th Cir. 1986), revd. on other grounds sub nom. <u>Bethesda Hosp.</u> <u>Association v. Bowen</u>, 485 U.S. 399 (1988); <u>Green v. Cashman</u>, 605 F.2d 945, 946 (6th Cir. 1979). In any event, petitioners' policy arguments do not override the terms of an unambiguous statute. See <u>In re Transcon Lines</u>, 58 F.3d 1432, 1437-1438 (9th Cir. 1995); <u>In re Kelly</u>, 841 F.2d 908, 913 (9th Cir. 1988).

We find that amounts received by petitioners from ElderPlace for adult foster home care are not qualified foster care payments under section 131(b) and are includable in gross income in each of the years at issue in this case.

<u>Expense Allocation Under Section 265</u>

The parties agree that petitioners incurred and paid certain expenses related to their operation of an adult foster home for all the years involved here. The parties also agree that petitioners received payments for providing adult foster home care for individuals, some of which are not includable in income.

Pertinent to these facts is section 265, which provides in part:

> SEC. 265(a). General Rule.--No deduction shall be allowed for--
>
> > (1) Expenses.--Any amount otherwise allowable as a deduction which is allocable to one or more classes of income other than interest (whether or not any amount of income of that class or classes is received or accrued) wholly exempt from the taxes imposed by this subtitle, or any amount otherwise allowable under section 212 (relating to expenses for production of income) which is allocable to interest (whether or not any amount

of such interest is received or accrued) wholly exempt from the taxes imposed by this subtitle.

Respondent determined that some of the adult foster home care expenses claimed by petitioners are expenses that are allocable to petitioner's tax-exempt income and are therefore nondeductible. Petitioner's position is that respondent's method of allocation is wrong.

Having determined that petitioners must include in income the payments received from ElderPlace, respondent argues that petitioners may deduct foster home care expenses only in the same ratio as the ratio of taxable income to total income.

Petitioners, rather than a pro rata allocation based on taxable and nontaxable income, would allocate expenses to three income categories:  (a) To adult foster care "service" income, some of which is tax exempt; (b) to "room and board" income, almost all of which is taxable;[7] and (c) to income related to both "service" and "room and board".  Petitioners characterize mortgage interest, real estate taxes and insurance, repairs, maintenance, depreciation, and food expense as "room and board" expenses.  Petitioners want the Court to allocate most "room and board" expenses to "room and board" income and almost none of it to "service" income.

---

[7]The parties agree that petitioners had a resident, Mr. Authur (sic) Armstrong, whose room and board was paid by the Oregon Department of Veterans' Affairs in 1993 and 1994 and is tax exempt.

Under section 1.265-1(b)(1), Income Tax Regs., the term "class of exempt income", as that term is used in section 265, means any class of income wholly excluded from gross income or wholly exempt from tax.  Allowable expenses directly allocable to any class of exempt income shall be allocated thereto and expenses directly allocable to any class of nonexempt income shall be likewise allocated thereto.  Where an expense is indirectly allocable to both a class of nonexempt income and a class of exempt income, "a reasonable proportion thereof determined in the light of all the facts and circumstances in each case shall be allocated to each."  Sec. 1.265-1(c), Income Tax Regs.

The class of gross income for which petitioners' deductions are denied under section 265 is section 131 qualified foster care payments.  In the case of petitioners, such payments are for "caring for a qualified foster individual <u>in the foster care provider's home</u>".  Sec. 131(b)(1)(B) (emphasis supplied).

Under Oregon State law the term "adult foster home" means a "<u>family home or facility in which residential care is provided</u> for five or fewer adults who are not related to the provider by blood or marriage."  Ore. Rev. Stat. sec. 443.705(1) (1992) (emphasis supplied).  The term "residential care" means providing "<u>room and board and services</u> that assist the resident in

activities of daily living".  Ore. Rev. Stat. sec. 443.705(6)
(1992) (emphasis supplied).

Although petitioners were separately paid for room and board
for most residents,[8] petitioners' exempt and nonexempt foster
care income was based on their home ownership.  In order to
qualify as having an adult foster home petitioners must under
Federal and State law provide the appropriate services in their
home, and they in fact did so in the years under consideration.
The expenses for mortgage interest, real estate taxes, insurance,
repairs and maintenance, utilities, depreciation, and "other"
home expenses were incurred as a result of or incident to their
adult foster home activity, and their income was derived from the
use of their home as an adult foster home.  There is a direct
factual relationship between those expenses and all petitioners'
adult foster home care income, both taxable and nontaxable.

We find that petitioners' business expenses that they have
characterized as "service" expenses, "room and board" expenses
and other expenses are related to all of petitioners' adult,
foster home care income and must be allocated between exempt
foster home care income and nonexempt foster home care income.
We further find that under the facts and circumstances of this
case, respondent's method of proportional allocation of expenses

---

[8]We note that there is no separately stated room and board
amount for petitioners' "private pay" residents.

between taxable and nontaxable income is correct.  See Mallinckrodt v. Commissioner, 2 T.C. 1128, 1148 (1943), affd. 146 F.2d 1 (8th Cir. 1945); McFarland v. Commissioner, T.C. Memo. 1992-440.

To reflect the foregoing,

Decision will be entered

under Rule 155.