111 T.C. No. 19


UNITED STATES TAX COURT



PAVEL DOBRA AND ANA DOBRA, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 7573-97.                    Filed December 29, 1998.



        H and W owned four residential properties located
in State O.  One of the properties was H and W's family
residence.  The other three were not.  H and W used the
properties to provide residential care for adults.
State O paid H and W for this care.  H and W did not
report any of the payments received from State O in
1992 and 1993, on the theory that the payments were
"qualified foster care payments", excluded from gross
income under sec. 131(a), I.R.C.  None of the
unreported payments were "difficulty of care payments",
as defined by sec. 131(c), I.R.C.

        <u>Held</u>:  To be excluded from gross income under sec.
131(a), I.R.C., the payments must be paid for care
provided in "the foster care provider's home" (sec.
131(b)(1)(B), I.R.C.).  A house or other dwelling is
"the foster care provider's home", only if the foster
care provider resides there.  There is no evidence in
the record that H and W resided in any of the three

properties that were not their family residence. Accordingly, we sustain R's determination that the payments received from State O for care provided at those three properties were not excluded from gross income under sec. 131(a), I.R.C.

Paul A. Stamnes, for petitioners.

Wesley F. McNamara, for respondent.

OPINION

BEGHE, Judge:  Respondent determined deficiencies of $20,692 and $24,180 in petitioners' Federal income tax for 1992 and 1993, respectively.  The only issue for decision is whether payments received by petitioners from the State of Oregon are to be excluded from petitioners' income under section 131(a) as "qualified foster care payments".[1]  To resolve this issue we must answer a question of first impression:  whether a house that is not the foster care provider's residence may constitute "the foster care provider's home" for purposes of section 131(b)(1)(B).

Petitioners Pavel Dobra and Ana Dobra, husband and wife (petitioners), resided in Portland, Oregon, at the time the petition was filed.

---

[1] All section references are to the Internal Revenue Code in effect during the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise specified.

All of the facts have been stipulated. The stipulation of facts and the exhibits are incorporated herein by this reference.<u>Factual Background</u>

During the tax years in issue--1992 and 1993--petitioners owned four residential properties in Portland, Oregon.[2] The addresses of these properties were:

1. 16001 NE Morris Street (the Morris Street property);

2. 1819 SE 117th Avenue (117th Avenue property);

3. 11847 SE Alder Street (Alder Street property); and

4. 4125 SE 134th Avenue (134th Avenue property)

(collectively, the properties).

The parties have stipulated that the Morris Street property was petitioners' "personal residence" and "personal family residence" during the years at issue. The record contains no information about petitioners' residential relationship to the other properties.

During 1992 and 1993, petitioners used the properties to provide residential care to adults. Five adult individuals received care at each of the properties, for a total of 20 individuals being cared for at any one time. The parties' briefs indicate that petitioners provided such care personally only at

---

[2] Ordinarily, we would refer to these properties as either "houses" or "homes". However, this case requires us to determine the meaning of petitioners' "home", for purposes of sec. 131. Therefore, we use the neutral term "properties".

the Morris Street property; petitioners apparently hired resident managers to act as the primary caregivers at the other properties.

The State of Oregon made the following payments to petitioners for care provided at the properties:

| Location | 1992 | 1993 |
|---|---|---|
| Morris Street property | $30,629 | $21,257 |
| 117th Avenue property | 28,556 | 27,443 |
| Alder Street property | 8,899 | 21,218 |
| 134th Avenue property | 14,092 | 10,216 |

Petitioners took the position that all these payments were excludable under section 131(a), and they did not report any of the payments on their returns.

In the notice of deficiency, respondent did not contest (and is not here contesting) the application of section 131 to the payments received from the State of Oregon for care provided at the Morris Street property, which is petitioners' "personal family residence". However, respondent determined (and urges us to hold) that the exclusion does not apply to the payments received for care provided at the other properties, none of which was petitioners' personal residence. Petitioners also received payments from private parties and from public agencies other than the State of Oregon (e.g., the U. S. Department of Veterans Affairs), but the tax treatment of these payments is not in dispute.

Discussion

Section 131(a) provides the general rule that "Gross income shall not include amounts received by a foster care provider * * * as qualified foster care payments."  Section 131(b) defines the "qualified foster care payments" (QFCP) referred to by section 131(a).  Under section 131(b)(1)(B), a payment may be a QFCP only if it is either a "difficulty of care payment", as defined in section 131(c), or is "paid to the foster care provider for caring for a qualified foster individual in <u>the foster care provider's home</u>" (emphasis added).[3]

Finally, section 131(b)(2) defines a "qualified foster individual" as "any individual who is living in <u>a foster family home</u>" (emphasis added).[4]

The parties have stipulated that none of the payments at issue were "difficulty of care payments".  Accordingly, the

_____

[3] Sec. 131(b) additionally requires that a "qualified foster care payment" (QFCP) be paid by a State or tax-exempt placement agency.  The payments at issue were made by the State of Oregon; and respondent has not argued in this case that the State payment requirement has not been met.  Cf. <u>Cato v. Commissioner</u>, 99 T.C. 633 (1992), in which the Commissioner argued that the payment requirement of sec. 131 was not satisfied because the tax-exempt placement agency was serving as a mere conduit for the payment of funds from another source.

[4] With respect to payments made for the foster care of adult individuals, the definition of a "qualified foster individual" in sec. 131(b)(2) also requires that the individuals were placed in the foster home by a State agency.  The parties have stipulated that neither the notice of deficiency nor the pleadings raises an issue as to whether this requirement was met.  Cf. <u>Micorescu v. Commissioner</u>, T.C. Memo. 1998-398.

parties assert--and we agree--that the outcome of this case depends upon the interpretation of the phrase "the foster care provider's home" in section 131(b)(1)(B).[5]

Petitioners' Position:  Any House We Own in Which Others Live Is Our "Home"

Petitioners' position is that each of the four properties is "the foster care provider's home"--even though they do not live in three of those "homes".  Petitioners claim that their position is supported by the plain meaning of section 131(b)(1)(B). Petitioners note that the properties are dwellings of the type commonly referred to as "houses" or "homes".  Petitioners also note that they own, and provide foster care in, those homes.[6] Therefore, according to petitioners, in ordinary, everyday speech, all the homes are their (i.e., the foster care providers') homes, and all such homes therefore satisfy the statutory standard--whether or not they reside in them.

Respondent's Position:  Meaning of Foster Family Home

---

[5] We note that if the payments at issue were "difficulty of care payments", a similar interpretative question would arise, because sec. 131(c)(1)(A)(ii) requires that difficulty of care payments be compensation for certain care provided "in the home of the foster care provider".

[6] The stipulation of facts describes petitioners' activities as "adult care", not as "foster care".  The parties' pleadings and briefs do not raise the issue whether the care provided in the properties qualified as "foster care" for purposes of sec. 131, or whether petitioners were "foster care providers" with respect to that care.  For purposes of the argument, we assume that all the care provided was "foster care" and that petitioners were "providers" of that care, within the meaning of sec. 131.

Respondent's position, by contrast, is that only the Morris Street property--the only property in which petitioners reside--can be "the foster care provider's home". Unlike petitioners' position, respondent's position is not based on any assertedly plain meaning of the statute. Instead, respondent asks us to adopt an interpretation of the term "foster care provider's home" that is based on a specialized definition of the term "foster family home" used in section 131(b)(2). Respondent asserts that "in a foster care context" or "among state and local governmental agencies" foster family home means "the family residence of a licensed foster care provider in which the licensee is the primary provider of foster care."

Employing this definition, respondent asserts that only the Morris Street property could be a foster family home, because only that property was petitioners' family residence. Respondent then concludes that only the Morris Street property could be the "foster care provider's home"--because any house that can be the "foster care provider's home" (i.e., the place where the foster individual must be cared for, under section 131(b)(1)(B)) must also be a "foster family home" (i.e., the place where the foster individual must live, under section 131(b)(2)).

As discussed below, we agree with respondent's ultimate conclusion that the payments made with respect to the properties other than the Morris Street property are not excluded under section 131(a). Nevertheless, we do not accept the specialized

definition of "foster family home" respondent asserts, for the
following reason.

Respondent argues that "foster family home" is a "term of
art" in the social work field, with a specialized meaning that we
must adopt in interpreting section 131.  However, respondent has
neither presented any admissible evidence of the meaning
asserted, nor asked us to take judicial notice of that meaning.
The only materials respondent has offered us--in respondent's
briefs--are citations to two social work treatises and some State
statutes.[7]  Our examination of these materials leads us to
conclude that they do not establish either that foster family
home is a term of art in the social work field, or that the term
has the meaning respondent asserts.  In addition, it appears to
us that the properties other than the Morris Street property

---

[7] The treatises cited in support of respondent's asserted
definition of "foster family home" are 1 Encyclopedia of Social
Work, "Foster Care for Adults" 634 (18th ed. 1987); Hubbell,
Foster Care and Families 120 (1981).  The State statutes cited
for this purpose are Cal. Welf. & Inst. Code sec. 11400(d) (West
Supp. 1998); Minn. Stat. sec. 144D.01(7) (West 1998); Minn. Stat.
sec. 257.071(1) (West 1998); Or. Rev. Stat. sec. 419A.004(24)
(1997).

An example of the difficulties we have with respondent's
approach is provided by respondent's citation of the foregoing
statutes to support the assertion that a "group home" cannot be a
"foster family home".  Respondent fails to mention that
Department of Health and Human Services regulations define
"foster family home" to include group homes, agency operated
boarding homes, or other licensed foster care facilities.  See 45
C.F.R. sec. 1355.20 (1998); Final Rule, Supplementary
Information:  Section by Section Discussion, 48 Fed. Reg. 23104,
23105 (May 23, 1983).

might satisfy respondent's definition of "foster family home"-- because those properties were the family residences of petitioners' resident managers, the licensed primary caregivers therein.[8]

Because respondent has not persuaded us that respondent's specialized or technical definition is necessary, helpful, or appropriate in this case, we see no reason to deviate from the general rule that a statute should be interpreted in accordance with the "plain" or "ordinary, everyday" meaning of its terms. United States v. Ron Pair Enter., Inc., 489 U.S. 235, 241-242 (1989); Richards v. United States, 369 U.S. 1, 9 (1962); Crane v. Commissioner, 331 U.S. 1, 6 (1947). Accordingly, we do not consider further respondent's argument with respect to the meaning of "foster family home"; instead, we turn our attention directly to the plain meaning of "the foster care provider's home" as used in section 131(b)(1)(B).

Plain Meaning of "The Foster Care Provider's Home"

As a preliminary matter, we note that section 131 does not define either "the foster care provider's home" or the term "home" more generally. In addition, although the term "home" is used numerous times elsewhere in the Code, the Code contains no general purpose definition of "home", applicable to all sections.

─────────────

[8] See Or. Rev. Stat. sec. 443.705(5) (1997) ("provider" means any person operating an adult foster home and includes a resident manager); Or. Rev. Stat. sec. 443.725(1) (1997) (every provider of adult foster care shall be licensed).

Having noted that this is a case of first impression, we observe that counsel have not referred us to--and we have not found--any cases interpreting "home" or "the foster care provider's home" for purposes of section 131.

Finally, the legislative history of section 131, in our judgment, provides little if any guidance to the meaning of "home", for purposes of adult foster care, that cannot also be gleaned from the plain language of the statute.[9]

---

[9] Sec. 131 was added to the Code by sec. 102(a) of the Periodic Payment Settlement Act of 1982, Pub. L. 97-473, 96 Stat. 2606. However, in its 1982 form, sec. 131 applied only to payments made to foster parents for caring for foster children.

Sec. 131 was amended to apply to payments made for adult foster care by sec. 1707(a) of the Tax Reform Act of 1986 (TRA 86), Pub. L. 99-514, 100 Stat. 2781. This amendment was added by the conferees. See H. Conf. Rept. 99-841 (the TRA 86 Conference Report) at II-838 and II-839 (1986), 1986-3 C.B. (Vol. 4) 838-839.

As we read the portions of the TRA 86 Conference Report dealing with adult foster care, they are no clearer than the plain language of the statute--with the possible exception of one sentence expressing the conferees' intent that the adult foster care exclusion be limited to "individuals who provide foster care within their own homes". TRA 86 Conference Report, supra at II-838, 1986-3 C.B. (Vol. 4) at 838. In this context, we note that on brief each party has cited this portion of the TRA 86 Conference Report.

With respect to the pre-TRA 86 legislative history of sec. 131, we are not certain that a definition of "the foster care provider's home" in the context of a statute that dealt solely with foster parents and foster children, would necessarily be relevant in the context of a statute expanded to include adult foster care. Nevertheless, we have reviewed the pre-TRA 86 history cited to us by the parties, and we conclude that it does not help interpret the statutory language.

Our work therefore begins with the text of section 131. As the Supreme Court has stated: "The task of resolving the dispute over the meaning of * * * [the statutory provision at issue] begins where all such inquiries must begin: with the language of the statute itself." United States v. Ron Pair Enter., Inc., supra at 241 (citation omitted). Moreover, where the statute's language is plain, the language is also where the interpretative task should end. Id. Finally, it is a fundamental tenet of statutory interpretation that "the words of statutes--including revenue acts--should be interpreted where possible in their ordinary, everyday senses." Crane v. Commissioner, supra at 6.

We have recently relied on the common, ordinary, and plain meaning of words to interpret another aspect of section 131: the requirement that the foster individuals be "placed" in the foster home by a State or certain specified agencies. See section 131(b)(2); Micorescu v. Commissioner, T.C. Memo. 1998-398. It is in this spirit--and the spirit of Crane v. Commissioner, supra-- that we turn to the language of section 131 at issue here.

Section 131(b)(1)(B) provides that a payment that is not a "difficulty of care payment" may be excluded only if it is "paid to the foster care provider for caring * * * in the foster care provider's home". All the payments at issue were paid to petitioners. Therefore, under the plain language of the statute

(substituting "petitioners" for "the foster care provider")[10] the payments may be excluded only if they were paid "for caring * * * in <u>the petitioners' home</u>". (Emphasis added.)

We believe that in ordinary, everyday speech the phrase "the petitioners' home" means the place (or places) where petitioners reside. Put more plainly, in order for a "house" to constitute "petitioners' home", petitioners must live in that house. As Justice Scalia has recently written: "People call a house `their' home when legal title is in the bank, when they rent it, and even when they merely occupy it rent-free--<u>so long as they actually live there</u>." <u>Minnesota v. Carter</u>, 525 U.S. ___, ___, 67 U.S.L.W. 4017, 4021 (1998) (Scalia, J., concurring). In the words of the poet's cliche, "It takes a heap o' livin' in a house t' make it home."[11]

The concept of home as residence is included in many everyday definitions of a person's home. For example, Webster's Ninth New Collegiate Dictionary 577 (1990) includes among its definitions of home: "one's place of residence: DOMICILE"; and "the focus of one's domestic attention". Similarly, Webster's New World Dictionary 645 (3d College ed. 1988) includes among its definitions "the place where a person (or family) lives; * * *

---

[10] As stated <u>supra</u> note 6, we assume for purposes of argument that petitioners were "foster care providers" with respect to all four properties.

[11] Guest, "Home", reprinted in Stevenson, The Home Book of Quotations 904 (9th ed. 1958).

the house, apartment, etc. where one lives or is living temporarily; living quarters".[12]

A similar definition, identifying a "home" as a place where the taxpayer resides, has been used by courts (including this Court) to interpret the meaning of one's home as used elsewhere in the Code. For example, "head of household" filing status--currently provided for in section 2(b)--is available to an unmarried individual who "maintains as his home a household which constitutes * * * the principal place of abode" of certain specified relatives or dependents. Sec. 2(b)(1)(A) (emphasis added). A great deal of litigation has arisen under the head-of-household provisions where:

1. The taxpayer ordinarily lives at location 1;

2. The taxpayer's relatives or dependents ordinarily live at location 2 (often as the result of a divorce); and

3. The taxpayer owns location 2, or otherwise pays the expenses of maintaining his relatives or dependents at location 2.

---

[12] We note that the cited dictionaries also include among their definitions of "home": "an establishment providing residence and care for people with special needs"; and "an institution for the care of orphans, people who are old and helpless, etc.". Webster's Ninth New Collegiate Dictionary 577 (1990); Webster's New World Dictionary 645 (3d College ed. 1988). However, we believe that in everyday speech a nursing home or similar facility would not be referred to as "someone's home", unless that someone actually lived in that facility.

On the basis of facts such as these, the taxpayer has often claimed head-of-household status, on the ground that the taxpayer "maintains as his home" the house (or other dwelling unit) occupied by his (or her) relatives or dependents at location 2.

In deciding head-of-household cases arising from this fact pattern, this Court has consistently held that the taxpayer must reside in a dwelling or house in order for it to qualify as the taxpayer's home.  For example, in denying head-of-household status to a taxpayer with respect to the former marital home in which he no longer resided, we wrote (in W.E. Grace v. Commissioner, 51 T.C. 685, 688 (1969), affd. per curiam 421 F.2d 165 (5th Cir. 1969)):

> It is an elementary rule of statutory interpretation that "the words of statutes--including revenue acts--should be interpreted where possible in their ordinary, everyday senses."  Crane v. Commissioner, 331 U.S. 1, 6 (1947).  By providing in plain language that the household required to be maintained * * * [under the substantially identical head of household provision in the 1939 Code] had to be maintained by the taxpayer "as his home," we think Congress intended that such household also had to be the taxpayer's place of abode or house in which he actually lived. * * *

In W.E. Grace we also considered the legislative history of (and Income Tax Regulations promulgated under) the head-of-household provisions.  However, our belief that the ordinary, everyday meaning of a person's "home" was his (or her) place of abode, was clearly a key factor in our decision.

In our earlier decision in <u>Clair Smith v. Commissioner</u>, 40 T.C. 591 (1963), revd. 332 F.2d 671 (9th Cir. 1964), we held that a taxpayer who owned two houses did not maintain as her home--and was not entitled to head-of-household status with respect to--the house that was not her domicile or principal place of abode. The U.S. Court of Appeals for the Ninth Circuit--to which an appeal of this case would lie--reversed our decision in <u>Clair Smith v. Commissioner</u>, <u>supra</u>, on the ground that although a person may have only one domicile, nothing in the statute provided that she could not have two homes. See <u>Clair Smith v. Commissioner</u>, 332 F.2d at 673. We note, however, that the taxpayer in <u>Clair Smith</u> occupied each of her houses during substantial portions of the years there at issue: she spent an average of 3-1/3 months per year at the secondary residence the Court of Appeals held was a "home", and only slightly more time (an average of 5 months per year) at her principal residence (traveling accounted for the remainder of her time).[13]

Subsequent to the opinion of the Court of Appeals in <u>Clair Smith</u>, we have repeatedly denied head-of-household status where

---

[13] We also note that under the statutory language at issue in <u>Clair Smith v. Commissioner</u>, 40 T.C. 591 (1963), revd. 332 F.2d 671 (9th Cir. 1964), the "household" the taxpayer was required to maintain had to be both the "home" of the taxpayer, and the "principal place of abode" of a qualifying relative or dependent of the taxpayer. The need to give these two terms distinct meanings was a major factor in the opinion of the Court of Appeals that a taxpayer could have two "homes". See <u>Clair Smith v. Commissioner</u>, 332 F.2d at 673. By contrast, "home" is the only residentially-related word used in sec. 131.

the taxpayer did not reside in the household at issue--not only in W.E. Grace v. Commissioner, supra, but also in later cases, see Williams v. Commissioner, 53 T.C. 58 (1969) (Clair Smith distinguished, and head-of-household status denied on the grounds that the taxpayer had never lived in his adopted son's house), affd. per curiam 441 F.2d 1168 (9th Cir. 1971); Biolchin v. Commissioner, T.C. Memo. 1969-197 (head-of-household status denied because the taxpayer did not physically occupy his former wife's house), affd. per curiam 433 F.2d 301 (7th Cir. 1970). Other Courts have used a similar approach to distinguish Clair Smith, and to hold that a house in which the taxpayer does not reside is not the taxpayer's home for purposes of the head-of-household provisions. See, e.g., Muse v. United States, 434 F.2d 349 (4th Cir. 1970).

On the basis of our head-of-household decisions--and our judgment about the ordinary meanings of words--we believe that a foster care provider must reside in a house or other residential structure, before that structure can qualify as "the foster care provider's home" for purposes of section 131.

We are well aware that we have interpreted other provisions of the Code as not always requiring "home" to have a residential connection. In particular, section 162(a)(2) provides for the deduction of business travel, meal, and lodging expenses incurred while the taxpayer is "away from home". We have long taken the position that a taxpayer's "home" for purposes of this provision

is his (or her) "principal place of employment", rather than his "residence". See Mitchell v. Commissioner, 74 T.C. 578 (1980); Kroll v. Commissioner, 49 T.C. 557 (1968).

We believe that the authorities under section 162 do not undermine our conclusion that "home" requires a residential connection for purposes of section 131. It is a fundamental policy of Federal income tax law that a taxpayer should not be entitled to a deduction for "personal" expenses, such as the ordinary expenses of everyday living. This policy is evidenced by section 262(a), which states that "Except as otherwise expressly provided * * * no deduction shall be allowed for personal, living, or family expenses." The interpretation of "home" to mean "principal place of business" for purposes of section 162(a)(2) has been based upon this policy. See Kroll v. Commissioner, supra at 562.

By contrast, we do not ascertain any legislative intent underlying section 131--or any policy of the statute as a whole--that either permits or requires us to depart from the general rule that our interpretation be governed by the plain meaning of the statutory language.[14] To the extent we are able to determine

---

[14] See United States v. Ron Pair Enter., Inc., 489 U.S. 235, 242 (1989) (quoting Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571 (1982)): "The plain meaning of legislation should be conclusive, except in the `rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters'"; see also United States v. American Trucking Associations, Inc., 310 U.S. 534, 543-544 (1940).

any intent or policy concerning section 131, we believe it tends to support our conclusion that the foster care provider must reside in his (or her) section 131 "home".[15]

Conclusion

Respondent has determined that the payments made with respect to the properties other than the Morris Street property are not excluded from petitioners' income under section 131. Respondent's determination is presumed to be correct; petitioners bear the burden of proof that respondent's determination is erroneous, and that they are eligible for the exclusion.[16]  The parties' presentation of this case fully stipulated does not change this burden of proof.  Rule 122; Borchers v. Commissioner, 95 T.C. 82, 91 (1990), affd. on another issue 943 F.2d 22 (8th Cir. 1991).

---

[15] We note that if petitioners' argument in this case were accepted, a foster care provider could own and operate as a business an unlimited number of "homes" for purposes of sec. 131. There is certainly no mention of any desire to exempt the adult home care business from tax, in either the express provisions of sec. 131, or in the legislative history cited by the parties. The requirement that the foster care provider must reside in his or her "home" imposes some limit on the number of qualifying homes a provider may own and operate, and is consistent with the limitation of sec. 131(b)(3) on the number of adult care recipients with respect to whom excludable payments can be made.

[16] Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a).  In addition, exclusions from taxable income should be construed narrowly, and taxpayers must bring themselves within the clear scope of the exclusion.  Graves v. Commissioner, 89 T.C. 49, 51 (1987), supplementing 88 T.C. 28 (1987).

For the reasons stated above, we hold that a foster care provider must reside in a house or other residential structure, in order for that structure to qualify as "the foster care provider's home" for purposes of section 131.

On the basis of the parties' stipulation of facts and related exhibits, we find that petitioners resided only in the Morris Street property. There is no evidence in the record that they resided at any time in any of the other three properties. We therefore hold that none of those three properties was "the foster care provider's home". Accordingly, the payments received by petitioners from the State of Oregon with respect to those properties are not excluded from gross income under section 131; respondent's determination is sustained.

Decision will be entered
for respondent.