T.C. Memo. 2001-51


UNITED STATES TAX COURT


JOSEPH B. CAMPBELL, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 8677-97.                    Filed February 28, 2001.


<u>Lawrence H. Crosby</u>, for petitioner.

<u>Jonathan P. Decatorsmith</u> and <u>Tracy Anagnost Martinez</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Judge</u>:  Respondent determined the following deficiencies and additions to tax with respect to petitioner's Federal income taxes:[1]

---

[1]All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the
(continued...)

|       |            | Additions to Tax | |
| Year  | Deficiency | Sec. 6651(a)(1) | Sec. 6654(a) |
|-------|------------|-----------------|--------------|
| 1990  | $7,447     | $1,828          | $480         |
| 1991  | 6,137      | 1,534           | 355          |
| 1993  | 6,934      | 1,734           | 290          |
| 1994  | 14,850     | 3,579           | 734          |

After concessions,[2] the issues for decision are:

(1) Whether per capita distributions of $19,070, $40,933, and $50,222 in 1991, 1993, and 1994, respectively, to petitioner from the Prairie Island Indian Community of the State of Minnesota (the tribe) arising out of the ownership and operation of a gambling casino constitute gross income;

(2) whether petitioner may exclude $31,238 of discharge of indebtedness income resulting from a foreclosure of mortgaged

---

[1](...continued)
Tax Court Rules of Practice and Procedure. Monetary amounts are rounded to the nearest dollar.

[2]Petitioner did not contest the following adjustments in his petition: (1) Wage income of $1,754 and $2,450 in 1990 and 1994, respectively; (2) interest income of $86, $92, $105, and $124 for 1990, 1991, 1993, and 1994, respectively; (3) patronage dividends income of $31, $18, and $18 for 1990, 1991, and 1993, respectively; (4) nonemployee compensation of $5,449 and $12,369 in 1990 and 1991, respectively; and (5) self-employment taxes, in connection with the nonemployee compensation he received during 1990 and 1991, of $770 and $1,747, respectively. Petitioner did not present evidence to dispute these adjustments at trial, and petitioner did not present argument on these adjustments in either his opening or reply brief. These adjustments are deemed conceded in accordance with Rule 34(b)(4). At trial, respondent conceded the "other income" adjustment of $16,250 determined in his notice of deficiency for 1994.

farm equipment during 1990 under section 108(a)(1)(C) as

qualified farm indebtedness;[3]

(3)  whether petitioner is entitled to deduct expenses

incurred in connection with services rendered on behalf of the

tribe or the tribal council during 1993 and 1994;[4]

(4)  whether petitioner is liable for additions to tax

pursuant to section 6651(a)(1) for failure to file returns for

1990, 1991, 1993, and 1994; and

(5)  whether petitioner is liable for additions to tax

pursuant to section 6654(a) for failure to make estimated tax

payments for 1990, 1991, 1993, and 1994.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  We

incorporate the stipulation of facts into our findings by this

reference.

---

[3]Petitioner did not contest this issue in his petition.
Petitioner contested this issue for the first time in his trial
memorandum, presented evidence on the issue at trial, and argued
in his opening brief that he was entitled to exclude the
discharge of indebtedness income.  Respondent did not object to
the Court's review of this issue.  Thus, we deem this issue tried
by consent and consider it before the Court.  See Rule 41(b);
Shea v. Commissioner, 112 T.C. 183, 190-191 n.11 (1999).

[4]Petitioner did not contest the issue in his petition.
However, petitioner presented evidence on the issue at trial and
argued in his opening brief that he was entitled to the
deductions.  Respondent did not object to the Court's review of
this issue.  Thus, we deem this issue tried by consent and
consider it before the Court.  See Rule 41(b); Shea v.
Commissioner, supra.

Petitioner resided in Welch, Minnesota, when the petition was filed.  As of the date the statutory notice of deficiency was mailed to petitioner, he had not filed Federal income tax returns or made any estimated tax payments for 1990, 1991, 1993, and 1994.

Petitioner is an enrolled member of the tribe and resided on its reservation at all relevant times.  Petitioner started farming on the reservation in or around 1979.  Petitioner raised corn and soybeans on approximately 270 acres of reservation land which he leased from the tribe until about 1992.  In 1992, the tribe reclaimed the land to expand its gambling operations.

The tribe approved its constitution and bylaws on June 20, 1936, and ratified its corporate charter on July 23, 1937.

Per Capita Distributions

The tribe owns and operates a gambling casino complex called Treasure Island Casino & Bingo (the casino) on its reservation. The tribe initially conducted class II gaming at the casino.  On

or about November 15, 1989, the tribe signed a compact[5] with the State of Minnesota for control of class III gaming.[6]

As an enrolled member of the tribe, petitioner is entitled to receive per capita distributions attributable to income derived from the tribe's casino. During the years 1991, 1993, and 1994, petitioner received per capita distributions of $19,070, $40,933, and $50,222, respectively. No Federal income taxes were withheld from petitioner's per capita distributions.

Prior Litigation

Petitioner in this case was also the petitioner in Campbell v. Commissioner, docket No. 9244-95 (Campbell I). At issue in Campbell I was the proper Federal income tax treatment of a 1992 per capita distribution from the tribe to petitioner arising out

---

[5]Under the Indian Gaming Regulatory Act (IGRA), Pub. L. 100-497, secs. 1-22, 102 Stat. 2467 (1988), current version at 25 U.S.C. secs. 2701-2721 (Supp. 2000), a tribal-State compact governing gaming activities on the Indian lands of the tribe shall take effect only when notice of the approval of the compact by the Secretary of the Interior is published in the Federal Register. See 25 U.S.C. sec. 2710(d)(3)(B). The tribal-State compact between the tribe and the State of Minnesota was approved by the Secretary, and notice of the approval was published in the Federal Register as required. See 55 Fed. Reg. 12292 (Apr. 2, 1990).

[6]At trial, respondent objected to the admission of Exhibits 36-J through 39-J on grounds of relevance, and we reserved final ruling on the admission of the exhibits. The exhibits included the constitution and bylaws of the tribe, the tribe's corporate charter, the tribal-State compact, and the Gaming Revenue Allocation Ordinance discussed infra. We overrule respondent's objection and admit the exhibits because we conclude that the exhibits are relevant to our discussion of the collateral estoppel issue, infra.

of the ownership and operation of the casino.  Campbell I was tried before Special Trial Judge D. Irvin Couvillion on October 4, 1996, in St. Paul, Minnesota.  The Court issued an opinion in Campbell I on November 6, 1997, in which it held that the per capita distributions were taxable as ordinary income rather than exempt farm income as asserted by petitioner.  See Campbell v. Commissioner, T.C. Memo. 1997-502.  On January 8, 1999, the Court of Appeals for the Eighth Circuit affirmed the Tax Court on this issue and remanded the case on another issue irrelevant to this case.  See Campbell v. Commissioner, 164 F.3d 1140 (8th Cir. 1999).  The U.S. Supreme Court denied a petition for writ of certiorari.  See Campbell v. Commissioner, 526 U.S. 1117 (1999).

Gaming Revenue Allocation Ordinance

On or about October 19, 1994, the tribe passed a resolution to amend its constitutional powers and adopted a Gaming Revenue Allocation Ordinance (the ordinance) which regulates the distribution of tribal profits to tribe members.  The ordinance was passed and adopted in accordance with the requirements of the Indian Gaming Regulatory Act (IGRA), Pub. L. 100-497, secs. 1-22, 102 Stat. 2467 (1988), current version at 25 U.S.C. secs. 2701-2721 (Supp. 2000).  The ordinance stated, in part:

> The Tribal Council shall insure that notification of the application of federal tax laws to tribal per capita payments be made when such payments are made. The Tribal Administration shall also implement a procedure by which qualified enrolled members who receive per capita payments can have applicable taxes

automatically deducted from per capita payments. The Tribal Administration shall include in the notice of the application of federal tax laws, a notice of the existence of the withholding procedure.

In approximately November 1994, the Department of the Interior notified the tribe that it had determined the ordinance was in compliance with the IGRA and had approved the ordinance.

Discharge of Indebtedness

Petitioner borrowed money from the U.S. Department of Agriculture, Farmers Home Administration (FmHA), on at least three different occasions for operating expenses and other uses with respect to his farming activity. On July 25, 1983, petitioner borrowed $32,326 from the FmHA. On May 30, 1984, petitioner borrowed $35,500 from the FmHA for annual operating expenses and to purchase an irrigation system. On January 8, 1987, petitioner borrowed an unknown amount from the FmHA. In order to receive loans from the FmHA, petitioner was required to prepare and submit a projection or "prospective plan" for each operating year the loan was effective.[7] At some point, petitioner entered into a security agreement for each of his FmHA loans granting the FmHA a security interest in some of his chattel, including a tractor, a combine, a planter, a wagon, a plow, and other farming equipment (chattel).

---

[7]The only projection included in the record concerned the period Jan. 1 through Dec. 31, 1990.

Around June 1989, petitioner received a notice from the FmHA indicating that he had defaulted on his loans and that the FmHA intended to enforce the security agreements against his chattel by repossessing, foreclosing on, or obtaining a court judgment against the property. Shortly thereafter, the FmHA foreclosed on petitioner's chattel. On or around November 18, 1989, the chattel was sold at auction by Schlegel Auction & Clerking Co. (Schlegel Auction) on behalf of the FmHA. On November 27, 1989, Schlegel Auction issued a joint check to petitioner and the FmHA for the auction proceeds of $13,790.

On January 31, 1990, the FmHA sent petitioner a letter indicating that petitioner had defaulted on his 1983 and 1984 loans and that he had an outstanding balance of $35,554 as of January 31, 1990. The letter also enclosed an Application for Settlement of Indebtedness. In 1990, the FmHA relieved petitioner of indebtedness in the amount of $31,238.[8]

Tribal Council Expenses

Petitioner served on the tribe's council from October 1983 until March 1990. While serving as a member of the tribal council, petitioner held various positions, including vice chairman and assistant secretary/treasurer. Petitioner held "about 17 different jobs" at various times, including Tobacco

---

[8]The record does not indicate the reason for the discrepancy in petitioner's outstanding FmHA loan balance as of Jan. 31, 1990, and the amount of indebtedness relieved by the FmHA.

Commissioner of the tribe, game warden, environmental specialist, and various volunteer positions on behalf of the tribal council.  From about September 1988 until June 1990, and again in 1994, petitioner earned $150 per week as Tobacco Commissioner.

Any expenses petitioner incurred in connection with services performed on behalf of the tribal council were covered by a reimbursement policy.  Under the reimbursement policy, petitioner was entitled to receive from the tribal council $75 for every meeting he attended, even when there were multiple meetings in a single day (meeting payments).  The meeting payments were an incentive to persuade people to attend meetings.  Under the reimbursement policy, petitioner was also entitled to claim reimbursement for meals, travel mileage, lodging, airfare, and other miscellaneous expenses.  According to the reimbursement policy, petitioner was required to submit a form detailing the expenses he incurred, with attached receipts, and requesting the meeting payments he was entitled to receive.  Petitioner kept track of his expenses by keeping calendars and receipts.

Sometime around February 1992, the tribal council stopped making reimbursements to petitioner.  Petitioner stopped submitting reimbursement requests around August 1993.

OPINION

Per Capita Distributions

Respondent argues that the doctrine of collateral estoppel precludes petitioner from relitigating the issue of whether petitioner's per capita distributions from the tribe are taxable as ordinary income.  Respondent asserts that the legal questions raised in Campbell I with respect to this issue are identical to those raised by petitioner in this case, and the only differences are the years and the amounts of tax due.  Respondent contends there has been no change in the controlling facts or the applicable law since the resolution of Campbell I.  Petitioner, on the other hand, argues that the primary issues and legal arguments raised in this case differ significantly from those raised in Campbell I.

The doctrine of collateral estoppel may be applied in Federal income tax cases.  See United States v. International Bldg. Co., 345 U.S. 502, 505 (1953); Commissioner v. Sunnen, 333 U.S. 591, 598 (1948).  "Under collateral estoppel, once an issue of fact or law is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation."[9]  Montana v. United States, 440

---

[9]Under the principles of res judicata, on the other hand, "a judgment on the merits in a prior suit bars a second suit
(continued...)

U.S. 147, 153 (1979) (citing <u>Parklane Hosiery Co. v. Shore</u>, 439 U.S. 322, 326 n.5 (1979)); see also <u>Commissioner v. Sunnen</u>, <u>supra</u> at 599-600; <u>Popp Telcom v. American Sharecom, Inc.</u>, 210 F.3d 928, 939 (8th Cir. 2000); <u>Monahan v. Commissioner</u>, 109 T.C. 235, 240 (1997), affd. without published opinion 86 F.3d 1162 (9th Cir. 1996); <u>Kroh v. Commissioner</u>, 98 T.C. 383, 401 (1992); <u>Gammill v. Commissioner</u>, 62 T.C. 607, 613 (1974).

In <u>Montana v. United States</u>, <u>supra</u> at 155, the Supreme Court established a three-prong test for applying collateral estoppel that requires a court to find: (1) The issues presented in the subsequent litigation are in substance the same as those issues presented in the first case; (2) the controlling facts or legal principles have not changed significantly since the first judgment; and (3) other special circumstances do not warrant an exception to the normal rules of preclusion. In <u>Peck v. Commissioner</u>, 90 T.C. 162, 166 (1988), affd. 904 F.2d 525 (9th Cir. 1990), we stated that the "three-pronged rubric provided by the Supreme Court in the <u>Montana</u> case embodies a number of detailed tests developed by the courts to test the

---

[9](...continued)
involving the same parties or their privies based on the same cause of action." <u>Parklane Hosiery Co. v. Shore</u>, 439 U.S. 322, 326 n.5 (1979). In this case, petitioner disputes different tax years than in Campbell I. "Each year is the origin of a new liability and of a separate cause of action." <u>Commissioner v. Sunnen</u>, 333 U.S. 591, 598 (1948); see also <u>Peck v. Commissioner</u>, 904 F.2d 525, 527 n.3 (9th Cir. 1990), affg. 90 T.C. 162 (1988). Res judicata, therefore, does not apply.

appropriateness of collateral estoppel in essentially factual contexts."  Building on the Supreme Court's analysis in Montana, this Court identified five requirements that must be satisfied for collateral estoppel to apply.  See Peck v. Commissioner, supra at 166-167; see also Commissioner v. Sunnen, supra at 599-600; Popp Telcom v. American Sharecom, Inc., supra at 939; Gammill v. Commissioner, supra at 613-615; Kersting v. Commissioner, T.C. Memo. 1999-197.

As articulated in Peck, the following requirements must be satisfied to invoke the doctrine of collateral estoppel:  (1) The issue in the second suit must be identical in all respects with the one decided in the first suit; (2) there must be a final judgment rendered by a court of competent jurisdiction; (3) the party against whom collateral estoppel is invoked must have been a party or in privity with a party to the prior judgment; (4) the parties actually must have litigated the issue and its resolution must have been essential to the prior decision; and (5) the controlling facts and applicable legal rules must remain unchanged from those in the prior litigation.  See Peck v. Commissioner, supra at 166-167.  The party asserting collateral estoppel as an affirmative defense, in this case respondent, bears the burden of proof.[10]  See Rule 142(a).

---

[10]As required by Rule 39, respondent affirmatively pleaded collateral estoppel by an amendment to answer filed by leave of
(continued...)

In both Campbell I and this case, the ultimate issue
presented is whether per capita distributions to petitioner from
the tribe arising out of the ownership and operation of a
gambling casino constitute gross income. In this case, the
parties stipulated that the primary issue in Campbell I was the
tax treatment of a per capita distribution to petitioner in 1992
from the tribe arising out of the ownership and operation of the
casino.

In Campbell I, we specifically stated that the primary issue
for decision was:

> Whether per capita distributions to petitioner from the
> * * * [tribe] arising out of the ownership and
> operation of a gambling casino constitute gross income,
> or whether such income is "derived directly" from land
> owned by the * * * [tribe] and is excludable from
> taxation pursuant to laws, treaties, or agreements
> between Indian tribes and the United States Government
> * * *. [Campbell v. Commissioner, T.C. Memo. 1997-
> 502.]

The only differences between the issue in this case and the issue
in Campbell I are the dollar amounts and years in controversy.
The fact that the dollar amounts in controversy and the tax years
involved in this case are different from those in Campbell I,
however, does not preclude the application of collateral
estoppel. See Union Carbide Corp. v. Commissioner, 75 T.C. 220,

---

[10](...continued)
the Court.

253 (1980), affd. 671 F.2d 67 (2d Cir. 1982).  The first of the Peck requirements is satisfied.

The second of the Peck requirements is also satisfied.  This Court issued an opinion in Campbell I on November 6, 1997, see Campbell v. Commissioner, T.C. Memo. 1997-502; on January 8, 1999, the Court of Appeals for the Eighth Circuit affirmed the Tax Court on this issue and remanded on another issue irrelevant to this case, see Campbell v. Commissioner, 164 F.3d 1140 (8th Cir. 1999); and the U.S. Supreme Court denied a petition for writ of certiorari, see Campbell v. Commissioner, 526 U.S. 1117 (1999).  The decision in Campbell I is final.  See sec. 7481(a)(3)(B).

With respect to the third and fourth of the Peck requirements, the parties do not dispute that petitioner was a party in Campbell I, and a reading of the decisions in Campbell I confirms the issue was actually litigated and was essential to the resolution of the case.  See Campbell v. Commissioner, T.C. Memo. 1997-502, affd. on this issue 164 F.3d 1140 (8th Cir. 1999).  Consequently, the third and fourth requirements are also satisfied.

In deciding whether the fifth Peck requirement is satisfied, we must analyze whether this proceeding involves "the same set of events or documents and the same bundle of legal principles that contributed to the rendering of" Campbell I.  Commissioner v.

<u>Sunnen</u>, 333 U.S. at 602. "If the legal matters determined in the earlier case differ from those raised in the second case, collateral estoppel has no bearing on the situation." <u>Id.</u> at 599-600; see also <u>Sydnes v. Commissioner</u>, 647 F.2d 813, 814-815 (8th Cir. 1981), affg. 74 T.C. 864 (1980).

Petitioner's principal argument against the application of collateral estoppel is that the controlling facts and applicable legal rules either have changed or differ significantly from those considered in Campbell I. We reject petitioner's principal argument.[11]

Except for the taxable years and the amounts at issue, the relevant facts in Campbell I and in this case are identical. The per capita distributions made to petitioner during 1991, 1993,

---

[11]In <u>Commissioner v. Sunnen</u>, 333 U.S. at 601 (fn. ref. omitted), the Supreme Court suggested that "if the relevant facts in the two cases are separable, even though they be similar or identical, collateral estoppel does not govern the legal issues which recur in the second case." It is not clear whether petitioner is relying on the separable facts doctrine articulated in <u>Sunnen</u>; however, even if he is, we still must reject his argument. The separable facts doctrine has been questioned and limited by the Supreme Court in <u>Montana v. United States</u>, 440 U.S. 147 (1979). See also <u>Peck v. Commissioner</u>, 904 F.2d at 527-528 ("The Supreme Court has rejected the separable facts doctrine in general terms, but has implied that it might have continuing validity in the tax context."). In addition, two Courts of Appeals have concluded that the separable facts doctrine is not good law after <u>Montana</u>. See <u>American Med. Intl., Inc. v. Secretary of HEW</u>, 677 F.2d 118, 120 (D.C. Cir. 1981) (per curiam); <u>Hicks v. Quaker Oats Co.</u>, 662 F.2d 1158, 1167 (5th Cir. 1981). Whether or not the separable facts doctrine has any continued viability, we conclude that there is no basis for applying the doctrine in this case.

and 1994 were made in the same form and under the same contractual agreements as the per capita distributions made in 1992 (the year at issue in Campbell I). In addition, petitioner conceded at trial that the facts in this case, save the years in dispute and amounts in controversy, are identical to the facts in Campbell I.[12] Because the context in which the issues of this case arise has not changed since Campbell I, normal rules of preclusion apply. See Montana v. United States, 440 U.S. at 161.

---

[12]The only fact that arguably changed since Campbell I is the fact that the Department of the Interior approved the tribe's "Gaming Revenue Allocation Ordinance" (ordinance) on or about Nov. 20, 1994. Petitioner argues that before the approval of the ordinance in 1994, the tribe "had the right to expect that its per capita distributions could be received as tax-free per capita distributions under its Constitution and Corporate Charter." We reject petitioner's argument. Contrary to petitioner's argument, the clear language of 25 U.S.C. sec. 2710(b)(3), which was enacted in 1988 (before Campbell I), provides that per capita distributions may be made "only if--(A) the Indian tribe has prepared a plan to allocate revenues to uses authorized by paragraph (2)(B); (B) the plan is approved by the Secretary as adequate, particularly with respect to uses described in clause (i) or (iii) of paragraph (2)(B); * * *; and (D) the per capita payments are subject to Federal taxation and tribes notify members of such tax liability when payments are made." In other words, the tribe must have had an approved plan in effect in order to make the per capita distributions in the first instance. The statute does not allow tribes without such a plan to make tax-free per capita distributions. Petitioner is not entitled to rely on the tribe's compliance, or noncompliance, with this statute in order to escape taxation. Further, the decision in Campbell I concerned tax year 1992, was tried in 1996, and was decided in 1997; therefore, petitioner was aware of the fact that the ordinance had been approved at the time of trial and could have made an identical argument at trial in Campbell I. Based on the above, the fact that the plan was not approved until 1994 does not alter the factual circumstances under which the per capita distributions were made and is of no consequence to our decision.

The only question, therefore, is whether there has been a "change in the legal climate" since the decision in Campbell I. Commissioner v. Sunnen, supra at 606.

Petitioner has not referenced, and we cannot find, any relevant change in the applicable law that warrants a second analysis of petitioner's case.  Although the IGRA was amended after the decision in Campbell I, none of the amendments are relevant to the issue presented.[13]  Notably, petitioner does not argue that any specific amendment to the IGRA would have had any

---

[13]The first amendment to the IGRA was the addition of 25 U.S.C. sec. 2717a as part of the Department of the Interior and Related Agencies Appropriations Act, 1990, Pub. L. 101-121, 103 Stat. 701, 718, current version at 25 U.S.C. sec. 2717a (Supp. 2000), which provides that, in fiscal year 1990 and thereafter, fees to be collected pursuant to 25 U.S.C. sec. 2717 (Supp. 2000) shall be available to carry out the duties of the National Indian Gaming Commission (NIGC).  The Technical Amendments to Various Indian Laws Act of 1991, Pub. L. 102-238, sec. 2(a) and (b), 105 Stat. 1908, current version at 25 U.S.C. sec. 2703(E) and (F) (Supp. 2000), added subpars. (E) and (F) to 25 U.S.C. sec. 2703 and added provisions to 25 U.S.C. sec. 2718 authorizing appropriation of necessary funds for operation of the NIGC for fiscal years beginning Oct. 1, 1991 and 1992.  In 1992, the Federal Indian Statutes:  Technical Amendments, Pub. L. 102-497, sec. 16, 106 Stat. 3255, 3261 (1992), current version at 25 U.S.C. sec. 2703 (Supp. 2000), struck out the words "or Montana" following the word "Wisconsin" in 25 U.S.C. sec. 2703(7)(E).  In 1997, the Department of the Interior and Related Agencies Appropriations Act, 1998, Pub. L. 105-83, sec. 123(a) and (b), 111 Stat. 1543, 1566, current version at 25 U.S.C. secs. 2717 and 2718 (Supp. 2000), made minor changes to the wording of 25 U.S.C. sec. 2717(a)(1) and (2), made minor wording amendments to 25 U.S.C. sec. 2718(a), and rewrote 25 U.S.C. sec. 2718(b).  In addition, the Department of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1998, Pub. L. 105-119, sec. 627, 111 Stat. 2440, 2522, current version at 25 U.S.C. sec. 2718 (Supp. 2000), rewrote 25 U.S.C. sec. 2718(a).

effect on the outcome of Campbell I or has any effect on this case.  Regardless of petitioner's failure to point to any specific changes in the law, we find that none of the amendments enacted after the decision in Campbell I has any bearing whatsoever on the resolution of the issue in this case.  We also note that we specifically addressed the IGRA in our decision in Campbell I.  See Campbell v. Commissioner, T.C. Memo. 1997-502.

Petitioner sets forth several alternative arguments in this case to support his contention that the per capita distributions should not be subject to Federal income taxes that were not made in Campbell I.[14]  One of those arguments, which petitioner describes as his "primary argument", is that "the United States approved a Constitution and a Corporate Charter for the * * * [tribe] in Minnesota.  * * *  These documents indicate that

---

[14]Petitioner also reiterated an argument he made in Campbell I based on Squire v. Capoeman, 351 U.S. 1 (1956).  Petitioner asserted that under Squire v. Capoeman, supra at 4, income "derived directly" from the land, including per capita distributions, is exempt from taxation.  Petitioner asserted that a portion of the per capita distributions received was from business income earned from operations other than gaming, such as a restaurant, a buffet, two "snack-bars", a gift shop, a tobacco shop, a marina, and an RV park-campground.  This exact argument was the crux of petitioner's argument in Campbell I, and we decline to consider the argument a second time.  See Campbell v. Commissioner, T.C. Memo. 1997-502.  In Campbell I, we specifically considered Squire v. Capoeman, supra, and held: "Income earned through the investment of capital or labor, such as restaurants, motels, tobacco shops, and similar improvements to the land, fails to qualify for the exemption * * *.  Under the rationale of these cases, the income derived from the operation of a casino would not be derived directly from the land." (Citations omitted.).

the tribe had the right to earn revenue or income and then to distribute these funds directly to the members of the tribe as per capita payments."  As petitioner stresses in his brief, the tribal constitution and the corporate charter predate the IGRA by approximately 50 years.

Evidence regarding the meaning and application of the tribal constitution and the corporate charter could have been admitted during the trial of Campbell I.  It was not.  See Jones v. United States, 466 F.2d 131, 136 (10th Cir. 1972); Monahan v. Commissioner, 109 T.C. at 246.  Petitioner's argument is nothing more than an alternative argument in support of his position on the identical issue presented in Campbell I.  Petitioner did not make this argument in the earlier proceeding.  As a general rule, taxpayers are not permitted to avoid the application of collateral estoppel simply by advancing new theories on issues decided against them in an earlier proceeding.  See Leininger v. Commissioner, 86 F.2d 791, 792 (6th Cir. 1936), affg. 29 B.T.A. 874 (1934); Estate of Goldenberg v. Commissioner, T.C. Memo. 1964-134; Pelham Hall Co. v. Carney, 27 F. Supp. 388 (D. Mass. 1939), affd. 111 F.2d 944 (1st Cir. 1940).  Indeed, had the present case been consolidated for trial with Campbell I, "one uniform result would necessarily have obtained".[15]  Peck v.

---

[15]It is noteworthy that, in making his argument that the applicable legal climate has changed since the year at issue in
(continued...)

<u>Commissioner</u>, 90 T.C. at 168.

> If the taxpayers' case was not effectively presented at the first trial it was their fault; affording them a second opportunity in which to litigate the matter, with the benefit of hindsight, would contravene the very principles upon which collateral estoppel is based and should not be allowed.  [<u>Jones v. United States</u>, <u>supra</u> at 136.]

See also <u>Peck v. Commissioner</u>, 904 F.2d at 530.

On brief, petitioner also made another alternative argument to the effect that the "legal relationship between the Tribe and the United States has changed over the tax years at issue since no one from the Tribe has questioned the constitutionality" of the IGRA.  Petitioner argued that the IGRA is unconstitutional insofar as it affords the United States the right to claim that per capita distributions are subject to Federal taxation, because under <u>California v. Cabazon Band of Mission Indians</u>, 480 U.S. 202 (1987), and <u>Seminole Tribe v. Butterworth</u>, 658 F.2d 310 (5th Cir. 1981), tribes have the right to economic self-determination over all matters (including gaming operations).

A taxpayer is not collaterally estopped from challenging a position on constitutional grounds not raised in the earlier proceeding.  See <u>Jaggard v. Commissioner</u>, 76 T.C. 222, 224-225 (1981); <u>Neeman v. Commissioner</u>, 26 T.C. 864, 866-877 (1956),

---

<sup>15</sup>(...continued)
Campbell I (1992), petitioner makes no distinction between the years at issue in this case that occurred before 1992 and the years at issue in this case that occurred after 1992.

affd. 255 F.2d 841 (2d Cir. 1958); Travers v. Commissioner, T.C. Memo. 1982-498.  In this case, however, petitioner's "constitutional" challenge is merely a bare assertion unsupported by any references to the U.S. Constitution or by any evidence at trial and in no way raises a valid constitutional claim.  See Morrow v. Commissioner, T.C. Memo. 1983-186.  In addition, the argument could have been raised in Campbell I.  See Leininger v. Commissioner, supra; Estate of Goldenberg v. Commissioner, supra; Pelham Hall Co. v. Carney, supra.  Both California v. Cabazon Band of Mission Indians, supra, and Seminole Tribe v. Butterworth, supra, were decided before the enactment of the IGRA.  Indeed, the IGRA was a congressional response to the Supreme Court's decision in California v. Cabazon Band of Mission Indians, supra, which followed a long line of cases that began with Seminole Tribe v. Butterworth, supra.  See S. Rept. 100-446, at 3071 (1988).

We hold that each of the requirements for applying the doctrine of collateral estoppel in this case has been satisfied and that collateral estoppel applies to preclude relitigation of the proper tax treatment of the per capita distributions paid to petitioner during the years at issue.  We sustain respondent's determination that petitioner's 1991, 1993, and 1994 per capita distributions of $19,070, $40,933, and $50,222, respectively, are subject to Federal income tax.

Discharge of Indebtedness

Gross income means all income from whatever source derived, including income from discharge of indebtedness. See sec. 61(a)(12); sec. 1.61-12(a), Income Tax Regs. Section 108(a)(1)(C) excludes from gross income discharge of indebtedness income if the indebtedness discharged is qualified farm indebtedness. Petitioner bears the burden of proof with respect to whether he is entitled to an exclusion. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

In order for income to be excluded under section 108(a)(1)(C), petitioner must prove: (1) The discharge was made by a qualified person, see sec. 108(g)(1); (2) the indebtedness was incurred directly in connection with the taxpayer's operation of the trade or business of farming, see sec. 108(g)(2)(A); and (3) 50 percent or more of the taxpayer's aggregate gross receipts for the 3 taxable years preceding the taxable year in which the discharge of such indebtedness occurs is attributable to the trade or business of farming, see sec. 108(g)(2)(B). The exclusion does not apply to a discharge to the extent the taxpayer is insolvent. See sec. 108(a)(2)(B). Exclusions from taxable income should be construed narrowly, and taxpayers must bring themselves within the clear scope of the exclusion. See Dobra v. Commissioner, 111 T.C. 339, 349 n.16 (1998) (citing

Graves v. Commissioner, 89 T.C. 49, 51 (1987), supplementing 88 T.C. 28 (1987)).

Respondent contends that petitioner realized $31,238 in gross income as a result of the FmHA's discharge of petitioner's indebtedness during 1990. Respondent does not dispute, for purposes of the section 108(a)(1)(C) exclusion, (1) that the FmHA is a qualified person, see sec. 108(g)(1); (2) that petitioner's indebtedness was incurred directly in connection with petitioner's operation of the trade or business of farming, see sec. 108(g)(2)(A); or (3) that petitioner was solvent, see sec. 108(a)(2)(B). Respondent argues, however, that petitioner fails to satisfy the test in section 108(g)(2)(B). See Lawinger v. Commissioner, 103 T.C. 428 (1994).

Petitioner testified that for 1987, 1988, and 1989 he earned gross income of approximately $250 per acre multiplied by 270 acres of farmed land, totaling approximately $65,000 per year. According to petitioner, he earned "somewhere in the neighborhood of around $250 an acre for corn" and "just a little less than that" for soybeans. On cross-examination, however, petitioner testified that only 110 acres of that land were "under the irrigator" and the remaining acres were not producing. Petitioner testified further that he kept annual production records as required by the FmHA in order to borrow money but that he could not produce these records at trial because the FmHA had

destroyed the documents. As evidence of his income, petitioner did present a projection or "prospective plan" he had prepared for the FmHA covering the period from January 1 through December 31, 1990, which was signed on March 5, 1990. The projection estimated, among other things, production and sales of petitioner's crops, cash farm operating expenses, debt repayment, and a summary of the year's business. Petitioner, however, introduced no credible evidence to prove his gross receipts from farming in 1987, 1988, and 1989.

Petitioner's income during 1987, 1988, and 1989 was not derived solely from farming. Petitioner served on the tribal council from October 1983 until March 1990. By his own admission, petitioner held "about 17 different jobs" at various times, besides the positions he held at the tribal council, including Tobacco Commissioner, game warden, environmental specialist, and various volunteer positions on behalf of the tribal council. Petitioner testified that from about September 1988 until June 1990, he earned $150 per week as Tobacco Commissioner. Petitioner did not testify about or produce any evidence of his income from any other jobs he held for any of the years at issue.

We are not required to accept petitioner's self-serving testimony as evidence of his income, particularly in the absence of corroborating evidence. See Tokarski v. Commissioner, 87 T.C.

74, 77 (1986); <u>Peterman v. Commissioner</u>, T.C. Memo. 1993-129 (citing <u>Geiger v. Commissioner</u>, 440 F.2d 688, 689 (9th Cir. 1971), affg. per curiam T.C. Memo. 1969-159, and <u>Urban Redev. Corp. v. Commissioner</u>, 294 F.2d 328, 332 (4th Cir. 1961), affg. 34 T.C. 845 (1960)). Petitioner has not presented any documentary evidence to prove his gross receipts from farming for 1987, 1988, and 1989. Petitioner's testimony regarding the income he estimated he earned from farming during the years at issue was contradictory and inconsistent. On this record, we cannot estimate, nor are we required to estimate, petitioner's income from farming. See <u>Cohan v. Commissioner</u>, 39 F.2d 540, 543-544 (2d Cir. 1930). In addition, we are not able to ascertain what income he earned from other sources during the years at issue. Petitioner has not met his burden of proving he received gross receipts of 50 percent or more from farming as required under section 108(g)(2)(B). Thus, we hold that petitioner is not entitled to the exclusion under section 108(a)(1)(C), and he must include $31,238 in gross income by reason of the discharge of his indebtedness.

<u>Tribal Council Expenses</u>

Petitioner claims he is entitled to deduct unreimbursed business expenses, travel costs, and mileage incurred while performing activities on behalf of the tribal council, or, in the alternative, that he is entitled to deduct such expenses as a

charitable deduction under sections 170 and 7871. In his brief, petitioner claims that, for 1993, he has not been reimbursed by the tribe for $7,072 in direct expenses and $4,950 in meeting payments (66 meetings charged at $75 each)[16] and, for 1994, he has not been reimbursed for $9,089 in direct expenses and $7,725 in meeting payments (103 meetings charged at $75 each).

Respondent argues that in order to claim a deduction under section 162(a), petitioner must have incurred and paid the expenses he seeks to deduct, and, therefore, petitioner cannot deduct the meeting payments. Respondent further argues that petitioner has not presented credible evidence to substantiate the deductions for direct expenses.

Section 162(a) Deduction

Section 162(a) permits a taxpayer to deduct the ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. See Commissioner v. Lincoln Sav. & Loan Association, 403 U.S. 345, 352 (1971). In order for a taxpayer "to be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and * * * the taxpayer's primary purpose for engaging in the activity must be for income or profit." Groetzinger v. Commissioner, 480 U.S. 23, 35 (1987). An expense is ordinary if

_____

[16]Petitioner actually claimed in his brief that he was owed $5,050 in meeting payments.

it is normal, usual, or customary within a particular trade, business, or industry or arises from a transaction "of common or frequent occurrence in the type of business involved."  Deputy v. du Pont, 308 U.S. 488, 495 (1940).  An expense is necessary if it is appropriate and helpful for the development of the business. See Commissioner v. Lincoln Sav. & Loan Association, supra at 353; Commissioner v. Heininger, 320 U.S. 467, 471 (1943). Section 262(a) disallows deductions for personal, living, or family expenses.  See also sec. 1.162-17(a), Income Tax Regs.

Section 162 also allows a taxpayer to deduct ordinary and necessary business expenses in excess of reimbursements from the taxpayer's employer.  See sec. 1.162-17(b)(3), Income Tax Regs.

> If the employee's ordinary and necessary business
> expenses exceed the total of the amounts charged
> directly or indirectly to the employer and received
> from the employer as advances, reimbursements, or
> otherwise, and the employee is required to and does
> account to his employer for such expenses, the taxpayer
> may * * * claim a deduction for such excess.  [Id.]

If the taxpayer wishes to secure a deduction for such excess, he must submit a statement with his return showing:  (1) "The total of any charges paid or borne by the employer and of any other amounts received from the employer for payment of expenses whether by means of advances, reimbursements or otherwise", sec. 1.162-17(b)(3)(i), Income Tax Regs.; and (2) "The nature of his occupation, the number of days away from home on business, and the total amount of ordinary and necessary

business expenses paid and incurred by him * * * broken down into such broad categories as transportation, meals and lodging while away from home overnight, entertainment expenses, and other business expenses", sec. 1.162-17(b)(3)(ii), Income Tax Regs. To account to his employer, within the meaning of section 1.162-17(b)(3), Income Tax Regs., means to submit an expense account or other written statement to the employer showing the business nature and the amount of business expenses. See sec. 1.162-17(b)(4), Income Tax Regs.

Section 274(d) generally provides that no deduction or credit shall be allowed for travel, entertainment, or a gift unless the taxpayer substantiates such expenditures by adequate records or by sufficient evidence corroborating the taxpayer's own statement. See sec. 1.274-5(a), (c), Income Tax Regs. "Ordinarily, documentary evidence will be considered adequate to support an expenditure if it includes sufficient information to establish the amount, date, place, and the essential character of the expenditure." Sec. 1.274-5(c)(2)(iii)(b), Income Tax Regs. Section 274(d) prohibits deductions for expenditures based on approximations or unsupported testimony of the taxpayer. See sec. 1.274-5(a), Income Tax Regs.

Deductions are a matter of legislative grace, and the burden of clearly showing the right to the claimed deduction is on petitioner. See Rule 142(a); INDOPCO, Inc. v. Commissioner, 503

U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).

Petitioner has not met his burden of proving that the expenses he allegedly incurred in 1993 and 1994 were incurred in connection with a trade or business of petitioner. Petitioner testified that he served on the tribal council from October 1983 until March 1990. Although the expenses he incurred were for activities performed on behalf of the tribal council in 1993 and 1994, there is no evidence that he was performing services for the tribal council "with continuity and regularity" or that his primary purpose for performing the services was "for income and profit". Groetzinger v. Commissioner, supra at 35.

Even if we were to assume that the expenses allegedly incurred by petitioner were in connection with a trade or business, petitioner failed to prove that he did not, and would not, receive the reimbursement to which he claimed he was entitled under tribal council reimbursement policies. Moreover, petitioner failed to substantiate the expenses he claimed he was entitled to deduct. Although petitioner maintained some records and offered those records into evidence at trial, the documentation was inconsistent, incoherent, and insufficient to enable us to determine which of the expenses, if any, were deductible and which were not. Petitioner submitted three types of proof to substantiate his expenses: (1) An "account of

expenses", (2) personal date books for 1993 and 1994, and (3) photocopied receipts and correspondence for 1993 and 1994. The "account of expenses" appears to have been prepared in preparation for this proceeding, and we give it no weight other than as a summary of items allegedly substantiated by other documentary evidence. The personal date books contain handwritten notes with a few numbers that do not appear to correlate with the numbers in petitioner's account of expenses. The receipts and correspondence are incomplete and insufficient to satisfy the requirements of section 162 and, where applicable, section 274. For example, most of the documents dealing with expenses that seem to be covered by section 274 do not provide the date, amount, place, and essential character of the expenditure as required by section 1.274-5(c)(2)(iii), Income Tax Regs.

For the reasons described above, we are unable to discern any adequate factual or legal basis for allowing petitioner a deduction for any of the expenses claimed under these circumstances. Accordingly, we hold that petitioner has not proven he was entitled to deduct either the meeting payments or his claimed unreimbursed direct expenses as ordinary and necessary business expenses under section 162(a).

Section 170 Deduction

Section 170 allows a deduction for any charitable contribution payment made within the taxable year.  For purposes of section 170, the definition of charitable contribution includes a contribution or gift to or for the use of a State, among other things, if the contribution is made for exclusively public purposes.  See sec. 170(c)(1).  Section 7871(a)(1)(A) treats Indian tribal governments as States for purposes of determining whether and in what amount any contribution or transfer to or for the use of such States is deductible under section 170.  Petitioner bears the burden of demonstrating he is entitled to the claimed deduction.  See Rule 142(a); INDOPCO, Inc. v. Commissioner, supra; New Colonial Ice Co. v. Helvering, supra.

The only evidence presented on this issue at trial was petitioner's own affirmative response to his attorney's question of whether it is possible for individuals to give gifts or make donations to the tribe.  Further, petitioner's overall testimony regarding his expenses reflects that his intent was to be paid $75 per meeting and to be reimbursed for his expenses, not to donate his time and money to the tribal council.[17]  See Commissioner v. Duberstein, 363 U.S. 278 (1960).  Petitioner's

---

[17]For example, on direct examination, petitioner characterized the unreimbursed expenses as "lost income" or a "loss".

entire argument on brief in support of a deduction under section 170 consisted of the following sentence: "[Section] 7871 of the Code treats tribes as States for charitable donation purposes." Petitioner has failed to meet his burden of proving he is entitled to a deduction under section 170 for expenses he allegedly incurred in connection with his activities for the tribe, and, therefore, petitioner is not entitled to a deduction under section 170.

Section 6651(a)(1) Additions to Tax

Section 6651(a) imposes an addition to tax for failure to file a return, in the amount of 5 percent of the tax liability required to be shown on the return for each month during which such failure continues, but not exceeding 25 percent in the aggregate, unless it is shown that such failure is due to reasonable cause and not due to willful neglect. See sec. 6651(a)(1); United States v. Boyle, 469 U.S. 241, 245 (1985); United States v. Nordbrock, 38 F.3d 440, 444 (9th Cir. 1994); Harris v. Commissioner, T.C. Memo. 1998-332. A failure to file a timely Federal income tax return is due to reasonable cause if the taxpayer exercised ordinary business care and prudence and, nevertheless, was unable to file the return within the prescribed time. See sec. 301.6651-1(c)(1), Proced. & Admin. Regs. Willful neglect means a conscious, intentional failure to file or reckless indifference. See United States v. Boyle, supra.

Petitioner conceded that, as of the date that respondent mailed the statutory notice of deficiency to petitioner, petitioner had not filed Federal income tax returns for 1990, 1991, 1993, or 1994. Petitioner failed to produce any evidence that his failure to file returns was due to reasonable cause. We also note that petitioner did not make an argument on this issue, except for a subject heading in his reply brief, which states: "Campbell should not be obligated to pay additions to tax based on his per capita income." We, therefore, sustain respondent's determination.

Section 6654(a) Additions to Tax

Section 6654(a) provides for an addition to tax in the case of any underpayment of estimated tax by an individual. The addition to tax under section 6654(a) is mandatory in the absence of statutory exceptions. See sec. 6654(a), (e); Recklitis v. Commissioner, 91 T.C. 874, 913 (1988); Grosshandler v. Commissioner, 75 T.C. 1, 20-21 (1980). With one limited exception,[18] "this section has no provision relating to reasonable cause and lack of willful neglect. It is mandatory

---

[18]Sec. 6654(e)(3)(B) provides for an exception for newly retired or disabled individuals where the taxpayer (1) either is retired after having attained the age of 62 or became disabled in the taxable year or the preceding taxable year in which the estimated payments were required to be made, and (2) can demonstrate that such underpayment was due to reasonable cause and not to willful neglect. Sec. 6654(e)(3)(B) does not apply in this case.

and extenuating circumstances are irrelevant." <u>Estate of Ruben</u> <u>v. Commissioner</u>, 33 T.C. 1071, 1072 (1960); see also <u>Grosshandler</u> <u>v. Commissioner</u>, <u>supra</u> at 21. None of the statutory exceptions under section 6654(e) applies in this case.

Petitioner concedes that as of the date the statutory notice of deficiency was mailed to him, he had not made any estimated tax payments for 1990, 1991, 1993, and 1994. Petitioner did not present any argument on this issue; therefore, the issue is deemed conceded. Respondent's determination is sustained.

We have carefully considered the remaining arguments of both parties for results contrary to those expressed herein, and, to the extent not discussed above, find those arguments to be irrelevant, moot, or without merit.

To reflect the foregoing and the concessions of the parties,

<u>Decision will be entered</u>

<u>under Rule 155</u>.