Colvin, Chief Judge: In 2005 and 2006 three (and then four) developmental^ disabled adults lived in a house on Emil Avenue in Shoreview, Minnesota. The Emil Avenue house was owned by Marylou and Jonathan Stromme, who cared for their clients and managed the property. The local government paid them more than $250,000 in 2005 and more than $300,000 in 2006 for providing this foster care service. The Code makes these payments tax free if the clients were cared for in the Strommes’ “home”. But as discussed below the Strommes owned and resided in another home, and worked in, but did not live in, the house on Emil Avenue in Shoreview. Thus we hold that they may not exclude the foster care payments from income for the years at issue. [1] FINDINGS OF FACT Judge Holmes, who was the trial Judge in this case, fully agrees with the findings of fact herein. The Strommes were Minnesota residents when they filed their petitions. Marylou Stromme grew up as one of 10 siblings in a small home, and it was her relationship with one of her brothers, Danny, that inspired her vocation. Danny was developmentally disabled and, following the custom of the time, had been sent to live in an institution called the Lake Owasso Children’s Home (which was later renamed the Lake Owasso Residence). Ms. Stromme stayed close to her brother, and from about the age of 12 began making regular weekend visits to the institution. Danny eventually was able to move in with the Strommes, and Ms. Stromme cared for him until his death in 2001. The course of her brother’s life left Ms. Stromme with a strong desire to help those with developmental disabilities. Before Danny died, she had become a board member of the Lake Owasso Residence. She had long been acquainted with the case managers there, and after Danny’s death one of them suggested that she think about operating a group home — a smaller residence usually in a family-friendly community that contemporary thinking has concluded provides a better life for developmentally disabled adults than large congregate care. But where? At the time, Ms. Stromme and her husband Jonathan Stromme owned two houses in Shoreview: one on Mound Avenue and another on Emil Avenue. They lived at the Mound Avenue house with their children and had purchased the Emil Avenue house as an investment in April 2001.[2] Petitioners chose to develop the Emil Avenue house as a group home. Mr. Stromme oversaw the extensive renovation of the Emil Avenue house. He added a fourth bedroom, a bathroom, and a living area in the basement and added a deck with a wheelchair ramp on the outside. He also sought the advice of a certified public accountant (C.P.A.), and then he and his wife started doing business as SISTER Group Home.[3] After the Strommes finished these preparations, the Ramsey County Human Services Department licensed them in 2003 as foster care service providers. The Emil Avenue house, with four bedrooms and an office area where the Strommes kept detailed records of client activities, was ready for business. Ms. Stromme took charge of caring for the clients. Doctor’s appointments were a constant, but the clients also went around town to “do everything like you would do as a normal person”. She organized events for them such as making Easter baskets, painting, and mowing lawns — including the lawn at the Strommes’ other house.[4] According to Ms. Stromme, she always had a client with her and the constant interaction was a “24/7 job”. To handle these client demands, the Strommes also had help. They hired six employees — most, including Jon and Molly, were family members, but at least one was not. These employees helped out both day and night. The sleeping arrangements, however, were tight; for part of 2005 there was an open bedroom, but for the rest of that year and 2006 the employees and the Strommes had to sleep on either the futon or the convertible sofa while they were on duty. Several neighbors saw the Strommes or their cars during the day. They saw them collecting mail there. And for all these neighbors knew, the Strommes lived there. What the Emil Avenue neighbors did not seem to know was that the Strommes owned another house. The Strommes sold their Mound Avenue house in April 2003 and moved into the one they bought on LaCasse Drive in nearby Anoka County. It was at the LaCasse Drive house that the Strommes held family get-togethers and celebrated the safe return of another son from service in Iraq. The LaCasse Drive house was also where they celebrated Thanksgiving and Christmas. Ms. Stromme found it a more restful place to recover from foot surgery. This was in part because the LaCasse Drive house was much larger than the one on Emil Avenue. Excluding the basement, the LaCasse Drive house had 2,808 square feet, in contrast to the 1,168 square feet of the Emil Avenue house — and it was large enough to accommodate the Strommes’ extended family and everyday life. Its six bedrooms often housed not only the Strommes and their two children, but also two other children from Ms. Stromme’s first marriage, plus Ms. Stromme’s brother, a niece, and two grandchildren. It also was large enough for the Strommes to bring their clients over for outings. Four of respondent’s witnesses — the Strommes’ neighbors on LaCasse Drive — had a good grasp of where the Strommes spent their time during 2005 and 2006, better than the Emil Avenue neighbors. The LaCasse Drive neighbors also knew the Strommes owned two houses, and those neighbors understood that the Strommes worked at the Emil Avenue house. They frequently saw Ms. Stromme leave in the morning to go to work at the Emil Avenue house and then return in the evening. They often saw Mr. Stromme working in the yard or on his cars; they saw both Strommes bringing in groceries and noted Ms. Stromme’s car was reliably in the driveway around dinnertime. They also credibly recounted scenes of the Strommes having ordinary suburban American fun, like returning from a Minnesota Wild hockey game or throwing a lively pool party — the Strommes had installed a pool in 2005. The pool was one of the LaCasse Drive house’s great features, giving the Strommes, and sometimes their visiting clients, a place to relax. The Strommes and their neighbors had some disagreements. We will not memorialize these in any great detail but only note that the resulting police reports show that the Strommes were present at the LaCasse Drive house and reported it as their residence. In 2006 the Strommes separated. By November of that year they had sold the LaCasse Drive house — Mr. Stromme moved to a home in Forest Lake, Minnesota, and Ms. Stromme found her own place. The Strommes considered making the LaCasse Drive house a group home in lieu of selling it, though they were not licensed by Anoka County. The State of Minnesota paid SISTER about $256,662 in 2005 and $305,561 in 2006. This enabled the Strommes, even after they took care of the Emil Avenue house and its clients, to pay the mortgage, the utilities, and the cost of improvements at the LaCasse Drive house.[5] Respondent determined that the payments from the State of Minnesota were taxable.[6] After allowing the Strommes some business expense deductions, i.e., depreciation, employment and real estate taxes, interest, and wages, respondent determined deficiencies and penalties that totaled more than $140,000. OPINION I. Section 131 The Strommes claim eligibility under the section 131 exclusion from income of qualified foster care payments. Under that section, petitioners may exclude the 2005 and 2006 payments if they were: • made pursuant to a foster care program of a State; • paid by a State or political subdivision thereof, or a qualified agency; and • paid to a foster care provider for the care of “a qualified foster individual in the foster care provider’s home.” [7] See sec. 131(b)(1). The parties disagree about the third requirement. Does the phrase “foster care provider’s home” merely require ownership, as petitioners contend; or does it mean the foster care must be provided in a taxpayer’s residence, as respondent contends? We conclude that it means the foster care must be provided in a taxpayer’s residence.[8] A. Ownership There are no regulations under section 131, and there is not much caselaw on the issue before us.[9] We explicate the meaning of “home” in section 131 by looking first to the text of the Code. If the meaning is plain, we generally enforce it according to its terms. See, e.g., United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241-243 (1989). If the language is ambiguous, we can consider the legislative history. See, e.g., Cato v. Commissioner, 99 T.C. 633, 640-641 (1992). The only case on the meaning of “home” in section 131 is Dobra v. Commissioner, 111 T.C. 339 (1998). In Dobra, the taxpayers owned four houses where they cared for developmentally disabled people, but conceded that only one house was their “‘personal family residence.’” Id. at 340. The Dobras nevertheless argued that because they owned each house, they could exclude payments tied to the individuals in all four. Id. at 342. We held, however, that under section 131 a person’s “home” is where he resides.[10] “Put more plainly, in order for a ‘house’ to constitute * * * [a home], petitioners must live in that house.” Id. at 345. Precedent fences us in: The Strommes’ mere ownership of the Emil Avenue house is insufficient to make it their home. B. Did the Strommes Live at the Emil Avenue House? It was easy enough to decide that the Dobras did not live in more than one of their houses — hired help provided the care — but the Strommes spent a lot of time at the Emil Avenue house in 2005 and 2006. Ms. Stromme had an office there, and that is where she kept records of the clients’ daily activities. Their neighbors regularly saw the Strommes at the house and saw the Strommes’ cars in the driveway. And respondent stipulated that the Strommes worked shifts at the Emil Avenue house. These facts show the Strommes were frequently present at and worked at the Emil Avenue house, but is that enough? We conclude that using a house for business[11] does not make it a residence. We interpret the Code’s use of the word “home” to mean the house where a person regularly performs the routines of his private life — for example, shared meals and holidays with his family, or family time with children or grandchildren. The Strommes did argue that the Emil Avenue house was a home in this sense. They pointed to the bedroom available to them there early in 2005, and then to the living room couch and basement sofa once the fourth client moved in. But they did not dispute that the other six employees also slept in the same locations when their turns for night shifts came. The Strommes focused as well on the location of their clothes, claiming that they had two dressers in the basement, with additional clothes stored in the laundry room.[12] Mr. Stromme also said that when he needed to stay at the LaCasse Drive house to make improvements, he would carry over personal items in a duffel bag.[13] The Emil Avenue neighbors either do not recall or never actually saw the living arrangements inside the Strommes’ Emil Avenue house. And one of the Strommes’ employees, Daniel Hess, testified that Ms. Stromme did not always sleep at the Emil Avenue house during the shifts he worked. We have only the Strommes’ word, but their unwillingness to admit that the LaCasse Drive house was even one of their “homes” casts serious doubt on their claim about living at the Emil Avenue house. The Strommes said they had a plan to make the LaCasse Drive house a group home, which limited their use of that house during the years at issue to visits with their children, repair work, and outings with their clients. They want us to believe that they did not eat lunch or dinner at the LaCasse Drive house and that Mr. Stromme slept there only when he needed to do repairs. Their actions do not match their words. The Strommes received a license from Ramsey County for the Emil Avenue house in a mere six months, even though they had to remodel the entire basement. In contrast, they never applied for a similar license from Anoka County during their more than three years at the LaCasse Drive house. And while their neighbors did see the Strommes working at the LaCasse Drive house, they also saw them doing everyday chores, from bringing in groceries and eating meals with the family to hosting late-night pool parties. Their neighbors on LaCasse Drive credibly testified that the Strommes said that they “worked” at Emil Avenue. We believe that admission and find that the Strommes lived at the LaCasse Drive house. It was a big house, with plenty of amenities. It was where they spent time with their children and grandchildren. It was the house where they lived their private life, while they worked at the Emil Avenue house. We therefore find that the LaCasse Drive house was their only home.[14] The payments that they received from the State of Minnesota in 2005 and 2006 are therefore taxable income. II. Accuracy-Related Penalty Respondent also determined that the Strommes are liable for the penalty under section 6662(a) for each year in issue, claiming that the Strommes’ exclusions of the foster care payments were negligent or in disregard of rules or regulations or led to substantial understatements of income tax. See sec. 6662(b)(1) and (2). Negligence, as the regulations define it, is the failure to make a reasonable attempt to prepare one’s tax returns, keep adequate books and records, substantiate items properly, or otherwise comply with the Code. Sec. 1.6662-3(b)(l), Income Tax Regs. Disregard of rules includes careless, reckless, or intentional disregard of Code provisions or regulations. Sec. 1.6662-3(b)(2), Income Tax Regs. And an understatement of income tax is substantial if it is more than $5,000 or 10% of the tax required to be shown on the return, whichever is greater. Sec. 6662(d)(1)(A). Respondent has met his burden of production for at least the substantial understatement ground by producing the income tax returns reflecting the error. See sec. 7491(c); Campbell v. Commissioner, 134 T.C. 20, 29 (2010), aff'd, 658 F.3d 1255 (11th Cir. 2011). The amounts excluded resulted in substantial understatements of income tax — since the Strommes did not report any taxable income for 2005 and 2006. But there is a reasonable cause and good faith defense to the penalty irrespective of whether it is based on negligence, intentional disregard, or a substantial understatement of income tax. See sec. 6664(c)(1). We find, taking into account all the relevant facts and circumstances, that the Strommes had reasonable cause for the positions taken on their returns and acted in good faith. See id.; sec. 1.6664-4(b)(l), Income Tax Regs. The Strommes reported the amounts of the receipts on their returns, albeit not as taxable income. They met all the other requirements of section 131. And while Dobra defines “home” as a “residence”, the Strommes’ situation was arguably different — the Dobras never litigated the question of whether they lived in more than one home. IRS publications do not even try to define what a “home” is in describing the foster care exclusion. Given the ambiguity in this area of the law, we find the Strommes’ confusion reasonable and honest. See Higbee v. Commissioner, 116 T.C. 438, 449 (2001) (noting that an honest and reasonable misunderstanding of fact or law weighs against imposing an accuracy-related penalty) (citing section 1.6664-l(b)(l), Income Tax Regs.). On the basis of these facts, particularly the Strommes’ honest attempts to calculate their tax liabilities, we therefore find that the Strommes had reasonable cause to take the reporting position that they did. Respondent counters that there are clear indicators the Strommes did not act in good faith. Respondent notes they failed to produce records to substantiate their foster care expenses and failed to substantiate when the fourth client came to the Emil Avenue house. Respondent also suggests that the Strommes relied on their C.P.A. to create a section 131 “facade”. The Strommes, however, did keep records. And the date that the fourth client entered the group home would not have changed the character of payments. We therefore reject respondent’s determination that the Strommes owe accuracy-related penalties. To reflect the foregoing, Decision will be entered under Rule 155. Reviewed by the Court. Cohen, Halpern, Foley, Vasquez, Gale, Thornton, Marvel, Goeke, Wherry, Kroupa, Holmes, Gustafson, Paris, and Morrison, JJ., agree with this opinion of the Court. Unless otherwise noted, all section references are to the Internal Revenue Code (Code) in effect for the years at issue; all Rule references are to the Tax Court Rules of Practice and Procedure. For the years in issue, the Strommes had claimed the Emil Avenue house as their “homestead”, affording them some real property tax relief. See, e.g., Minn. Stat. Ann. sec. 273.1384, subdiv. 1 (West 2007). SISTER stands for Success in Special Needs Together Encouraging Residents. The reason for the last activity, according to the Strommes, was that a client “was ‘compulsive’ about mowing grass”, and in fact had to be monitored or else would mow all the time. The record is, for the most part, ambiguous about the exact cost of running SISTER Group Home. The Strommes drew less than bright lines between their personal expenses and the expenses of their clients. It is difficult for us to understand how certain expenses relating to trips to Mazatlan, Mexico, and to Treasure Island Resort and Casino in Welch, Minnesota, paid with SISTER’s American Express card, aided the four developmentally disabled adults living at the Emil Avenue house. The Strommes did report some taxable business income on their 2005-06 returns: $10,632 from Ms. Stromme’s windshield repair business and a separate payment to Ms. Stromme of $2,400 for adult foster care, which she did not explain at trial. The sec. 131 requirements we list are those relevant to the Strommes’ situation for the years at issue. We need not consider whether the foster care may be provided in a taxpayer’s second home because in this case the care was not provided in petitioners’ second home; the place the care was provided was not petitioners’ primary or second home. For now, the better course is “to observe the wise limitations on our function and to confine ourselves to deciding only what is necessary to the disposition of the immediate case.” Whitehouse v. Ill. Cent. R.R., 349 U.S. 366, 372-373 (1955); Ashwander v. TVA, 297 U.S. 288, 345-346 (1936) (Brandeis, J., concurring); accord Liverpool, N.Y. & Phila. S.S. Co. v. Emigration Comm’rs, 113 U.S. 33, 39 (1885). Our silence on the issue should not be construed as our agreement with either party’s argument. There is caselaw construing the phrases “paid by a State or political subdivision thereof or by a placement agency”, see Cato v. Commissioner, 99 T.C. 633, 640-646 (1992), and “qualified foster individual”, see Micorescu v. Commissioner, T.C. Memo. 1998-398. We also found that the legislative history of sec. 131 “provides little if any guidance to the meaning of ‘home’, for purposes of adult foster care, that cannot also be gleaned from the plain language of the statute.” Dobra v. Commissioner, 111 T.C. 339, 344 (1998). We do not read sec. 131 as prohibiting a profit motive. They also claimed that they received both personal mail (such as Christmas cards) and business mail at the Emil Avenue house; but the record contained specific examples of only the latter, some using the Emil Avenue address and others (e.g., tax documents and bank statements) the LaCasse Drive address. The fact that the Strommes homesteaded the Emil Avenue house, but not the LaCasse Drive house, also fails to convince us. The Strommes claimed that they could not homestead the LaCasse Drive house because it was not their home. We disagree. The Strommes listed the LaCasse Drive house as their principal residence on their 2003 Certificate of Real Estate Value filed with the State — rebutting their assertion. In fact, declaring the LaCasse Drive house their homestead was not in their financial interest. The Emil Avenue house was eligible for the homestead tax credit, but the LaCasse Drive house was not. The Strommes bought the LaCasse Drive house for $415,000 and the Emil Avenue house for $123,000. The homestead tax credit is phased out completely for property valued over $413,000. See Minn. Stat. Ann. sec. 273.1384, subdiv. 1 (homestead credit equal to 0.4% of the first $76,000 of the property value minus 0.09% of the excess of $76,000). Although the Strommes sold the LaCasse Drive house in November 2006, it is unclear exactly when, and for where, Marylou Stromme left. Mr. Stromme claimed she went to the Emil Avenue house. A LaCasse Drive neighbor remembered Ms. Stromme’s moving to the Floral Bay Drive house. We do not know where the Strommes’ children moved. Without support for the position that Ms. Stromme in fact moved to the Emil Avenue house in 2006, see Rule 142(a), we cannot allow her an exclusion for even part of the year.