# United States Tax Court

T.C. Memo. 2026-46

ALVIE N. PASCHALL AND PATRICIA C. PASCHALL,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

_____

Docket No. 7382-24.                                    Filed June 4, 2026.

_____

Alvie N. Paschall and Patricia C. Paschall, pro sese.

*James M. Schutt, Jr.*, *Brittany M. Reid*, *Najja O. Bullock*, *Lesley A. Hale*, and *Patsy A. Clarke*, for respondent.

MEMORANDUM OPINION

PUGH, *Judge*: In a Notice of Deficiency dated February 5, 2024, the Internal Revenue Service (IRS or respondent) determined a deficiency of $24,599 in petitioners' 2021 federal income tax and an accuracy-related penalty of $4,920 pursuant to section 6662(a).[1] After concessions, the only remaining issue is whether petitioners received and failed to report $33,354 in other income attributable to cryptocurrency staking rewards.

_____

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

[*2]                              *Background*

Petitioners resided in California when they timely filed their Petition. This case was submitted fully stipulated pursuant to Rule 122. The stipulated facts are incorporated by this reference.

I.    *Cryptocurrencies and blockchain technology, generally*

Many of the facts and arguments in this case require familiarity with the mechanics of cryptocurrencies. Because the parties did not present expert testimony or stipulate these general principles, we have drawn this general overview of cryptocurrencies and blockchain technology from caselaw, administrative guidance, and articles.

Digital assets, commonly described as cryptocurrencies, are "any digital representation of value which is recorded on a cryptographically secured distributed ledger [such as a blockchain] or any similar technology as specified by the Secretary." § 6045(g)(3)(D). Cryptocurrencies are issued in units such as coins or tokens and have an identifiable value in U.S. dollars. They do not exist in physical form but rather as computer code that is stored on a blockchain. *See* Paul Tierno, Cong. Rsch. Serv., R47425, Cryptocurrency: Selected Policy Issues 3–4 (2023).

Cryptocurrencies are held in accounts also known as wallets. "Although a digital wallet does not serve exactly the same function as a bank account, the overarching purpose (storage and transfer of funds) is analogous." *United States v. Rezapour*, No. 21-50103, 2022 WL 3210689, at *2 (9th Cir. Aug. 9, 2022). Examples of digital asset wallets include hosted custodial wallets and unhosted noncustodial wallets. For a hosted wallet a custodian stores the private keys of the underlying digital assets on behalf of its customers. *See* Treas. Reg. § 1.6045-1(a)(25)(ii). Digital asset platforms serve as custodians, allowing customers to buy, sell, and hold various cryptocurrencies on the platform, similar to brokerages holding stocks for investors. Tierno, *supra*, at 15.

Distributed ledger technology, or blockchain, is a digital ledger on which transactions are chronologically recorded and cryptographically secured. *Id.* at 4. This design prevents modifications to the transactions once recorded and validated. *Id.* Copies of the blockchain are maintained by various digital systems or devices operating independently, referred to as "nodes." *See* Rev. Rul. 2023-14, 2023-33 I.R.B. 484. The nodes reach an agreement on how to maintain and update the blockchain in

**[*3]** accordance with the underlying protocol. "To reach consensus, embedded in each blockchain platform is a software protocol, or consensus mechanism, which provides governance standards over how information is added to the blockchain." *Friel v. Dapper Labs, Inc.*, 657 F. Supp. 3d 422, 427 (S.D.N.Y. 2023).

Cryptocurrencies typically use two consensus protocols to validate the blockchain[2] and distribute new tokens: proof of work and proof of stake. A proof-of-work protocol, used by popular cryptocurrencies such as Bitcoin, requires participants (miners) to solve complex mathematical problems relating to recent unverified transactions. Abraham Sutherland, *Cryptocurrency Economics and the Taxation of Block Rewards*, 165 Tax Notes Fed. 749, 754 (2019). Once a miner solves the problem, the solution is broadcast to other nodes that verify that the solution is correct. *See Dapper Labs*, 657 F. Supp. 3d at 427–28. If the solution is accepted, the successful miner usually receives a reward of the same token.

A proof-of-stake protocol, most popularly used by Ethereum and Tezos, requires comparatively less computational effort to validate the blockchain. No miners are required in a proof-of-stake protocol. Instead, token holders "stake" their tokens as collateral (stakers). *Id.* at 428. Stakers often must stake a minimum number of tokens to serve as validators.[3] Stakers are selected by algorithm to confirm the validity of new blocks to the blockchain. *Lido DAO*, 757 F. Supp. 3d at 957. Their selection may be based on the quantity of tokens staked, their tenure as validators, or luck. *See* Paolo Tasca & Claudio J. Tessone, *A Taxonomy of Blockchain Technologies: Principles of Identification and Classification*, 4 Ledger 1, 11 (2019), https://www.ledgerjournal.org/ojs/ledger/article/view/140/118. Stakers risk forfeiting staked tokens if they dishonestly or incorrectly validate transactions. *Lido DAO*, 757 F. Supp. 3d at 957. If stakers are selected and they successfully validate, they receive rewards of the same token. *Id.*

---

[2] Decentralized cryptocurrencies generally rely upon open, publicly available ledgers to record token ownership. Because these ledgers can be modified, blockchains include a verification mechanism that compares various copies of the ledger against one another to maintain accuracy and security. *See Dapper Labs*, 657 F. Supp. 3d at 427.

[3] Token holders may join staking pools with other owners to satisfy minimum quantity requirements. *See Samuels v. Lido DAO*, 757 F. Supp. 3d 951, 957 (N.D. Cal. 2024).

[*4] II.     *Mr. Paschall's eToro account*

During the year at issue Mr. Paschall[4] was the sole owner of an account with eToro USA, LLC, a digital asset platform. His eToro account held tokens in Cardano, a cryptocurrency using a proof-of-stake blockchain. Cardano tokens could be held on platforms other than eToro.

III.     *eToro's staking service*

On October 1, 2020, eToro announced a staking service for customers who held Cardano tokens. eToro executed the staking process on behalf of its customers. By default customers' Cardano tokens were staked; however, customers could opt out of the staking service. Customers who opted out did not receive staking rewards. Customers retained ownership of their tokens, regardless of whether their tokens were staked.

Customers received staking rewards in proportion to the number of tokens they held in their eToro accounts. eToro distributed the staking rewards monthly in the form of Cardano tokens. Customers received 75% to 90% of the staking rewards, while eToro retained 10% to 25% as a fee, with the exact percentage dependent on the customer's membership level. Mr. Paschall neither owned nor operated the eToro staking pool.

IV.     *Staking rewards received by Mr. Paschall*

Mr. Paschall's Cardano tokens were staked through eToro for the entirety of tax year 2021; he never opted out. Cardano tokens were added to his account as staking rewards monthly; no action was required by Mr. Paschall to accept them. The tokens that Mr. Paschall received as staking rewards were indistinguishable from the existing tokens in his account. Mr. Paschall could sell any of his Cardano tokens for cash at any time.

On November 23, 2021, Mr. Paschall received notice from eToro stating its intent to delist the Cardano cryptocurrency from its service in early 2022. From that date until the end of 2021, eToro restricted his ability to transfer his Cardano tokens to another account or platform. He retained the ability to sell any of his tokens but did not during this

---

[4] The parties stipulated that Mr. Paschall owned the Cardano tokens. For the purposes of our analysis it is immaterial whether the Cardano tokens were owned solely by Mr. Paschall or held jointly with Mrs. Paschall.

**[\*5]** period. In 2022 Mr. Paschall transferred his Cardano tokens to another platform.

eToro issued to Mr. Paschall Form 1099–MISC, Miscellaneous Information, for tax year 2021 reporting $33,354 in other income attributable to the staking rewards. Petitioners did not receive the Form 1099–MISC as it was sent to their former address. They first became aware of the Form 1099–MISC upon the IRS's issuance of Notice CP2000, dated November 13, 2023, proposing adjustments to their 2021 tax liability.

*Discussion*

I.  *Burdens of proof and production*

Ordinarily, taxpayers bear the burden of proving that the Commissioner's determinations in a Notice of Deficiency are erroneous. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). The burden of proof may shift to the Commissioner if the taxpayer produces credible evidence with respect to any factual issue relevant to ascertaining the taxpayer's liability and establishes that he or she complied with the requirements of section 7491(a)(2)(A) and (B) to substantiate items, maintain required records, and cooperate fully with the Commissioner's reasonable requests. § 7491(a).[5]

In addition, if a taxpayer raises a reasonable dispute with respect to a third-party information return and has cooperated fully with the Commissioner otherwise, the burden of production may shift to the Commissioner to present reasonable and probative evidence to verify the information return. § 6201(d); *see McQuatters v. Commissioner*, T.C. Memo. 1998-88, 1998 WL 88180, at \*3–4.

Petitioners contend that both burdens should be shifted to respondent. They claim that they did not receive the Form 1099–MISC and that eToro did not issue to them a similar Form 1099–MISC for staking rewards received in tax year 2020 or 2022. Petitioners further assert that they cooperated fully with respondent's requests.

Resolution of this case does not hinge on which party bears either burden. The parties stipulated that in 2021 Mr. Paschall's eToro account

---

[5] Submitting this case for decision under Rule 122 "does not alter the burden of proof, or the requirements otherwise applicable with respect to adducing proof, or the effect of failure of proof." Rule 122(b).

**[\*6]** received as staking rewards Cardano tokens valued at $33,354. *See Hardy v. Commissioner*, 181 F.3d 1002, 1005 (9th Cir. 1999) (noting that the parties' stipulations may link a taxpayer to unreported income), *aff'g* T.C. Memo. 1997-97. We now must decide as a matter of law whether those staking rewards were taxable upon receipt in 2021.

II.     *Taxation of cryptocurrency*

Cryptocurrency is treated as property for federal income tax purposes. *See Kim v. Commissioner*, T.C. Memo. 2023-91, at \*4; *see also Strashny v. Commissioner*, T.C. Memo. 2020-82, at \*8 (describing cryptocurrency as an asset to be considered for collection purposes in an administrative hearing). The IRS first provided guidance on the taxation of cryptocurrency in I.R.S. Notice 2014-21, § 4, Q&A-1, -7, 2014-16 I.R.B. 938, 938–39, in which it concluded that cryptocurrency may be treated as a capital asset. The Notice further stated that tokens generated from mining in a proof-of-work protocol were includible in gross income on the date of receipt. *Id.* § 4, Q&A-8, 2014-16 I.R.B. at 939.

In Revenue Ruling 2023-14, 2023-33 I.R.B. 484, the IRS addressed staking rewards for a cash method taxpayer that staked cryptocurrency on a proof-of-stake blockchain. It concluded that "the fair market value of the validation rewards received is included in the taxpayer's gross income for the taxable year in which the taxpayer gains dominion and control over the validation rewards" and that the fair market value of the rewards would be determined as of that date.[6] *Id.*, 2023-33 I.R.B. at 485.

III.    *Staking rewards*

Petitioners contend that the staking rewards should not be included in their gross income upon receipt. To decide this question we apply tax principles applicable to all assets.

A.      *Dominion and control*

A taxpayer's gross income generally includes "all income from whatever source derived." § 61(a); *see Charley v. Commissioner*, 91 F.3d

---

[6] As discussed below, we do not rely upon Revenue Ruling 2023-14 for our conclusion; we cite it only for completeness. We note that "[w]e are not bound by revenue rulings; under *Skidmore*, the weight we afford them depends upon their persuasiveness and the consistency of the Commissioner's position over time." *Webber v. Commissioner*, 144 T.C. 324, 352–53 (2015) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

[*7] 72, 73–74 (9th Cir. 1996), *aff'g in part, rev'g in part* T.C. Memo. 1993-558. "The starting point in all cases dealing with the question of the scope of what is included in 'gross income' begins with the basic premise that the purpose of Congress was 'to use the full measure of its taxing power.'" *James v. United States*, 366 U.S. 213, 218–19 (1961) (quoting *Helvering v. Clifford*, 309 U.S. 331, 334 (1940)). When Congress wishes to exempt income from inclusion, it does so explicitly. *See id.* at 219.

Gross income's expansive definition includes all accessions to wealth realized and over which the taxpayer has complete dominion and control. *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 431 (1955). "The income that is subject to a man's unfettered command and that he is free to enjoy at his own option may be taxed to him as his income, whether he sees fit to enjoy it or not." *Corliss v. Bowers*, 281 U.S. 376, 378 (1930).

When a taxpayer computes his taxable income under the cash basis method of accounting, he must report income for the earliest year that he actually or constructively receives the income. Treas. Reg. § 1.451-1(a). A taxpayer has constructively received income in the year that he has money credited to his account, has money set aside for him, or otherwise has money made available so that he may draw upon it at any time. Treas. Reg. § 1.451-2(a). If control of this money is subject to a substantial limitation or restriction, however, the taxpayer has not constructively received the income. *Isaacson v. Commissioner*, T.C. Memo. 2020-17, at *27, *aff'd*, No. 20-71121, 2022 WL 541617 (9th Cir. Feb. 23, 2022); Treas. Reg. § 1.451-2(a).

The parties agree that Mr. Paschall received staking rewards in the form of additional Cardano tokens credited to his eToro account. The staking rewards once received were not subject to any sale restrictions. Mr. Paschall could convert them to cash at any time, just like the underlying staked tokens.

Petitioners contend that Mr. Paschall did not possess dominion and control over the staked tokens because eToro restricted his ability to transfer Cardano tokens to another wallet. But as discussed above, he could convert the tokens to cash at any time. As the Supreme Court noted in *Helvering v. Horst*, 311 U.S. 112, 118 (1940), the "power to dispose of income is the equivalent of ownership of it." In the context of annuities, this Court has noted that "the limitation of withdrawals to cash, rather than shares, d[id] not reflect a lack of ownership or control."

[*8] *Webber*, 144 T.C. at 359 (quoting *Christoffersen v. United States*, 749 F.2d 513, 516 (8th Cir. 1984)). Even though Mr. Paschall chose not to sell the staking rewards during 2021, he had the ability to do so. The restriction on transfers to wallets hosted by services other than eToro does not negate Mr. Paschall's accession to wealth upon his receipt of the staking rewards.

## B. *Dividends*

Petitioners also argue that staking rewards should not be "taxed until realized through a sale or disposition," equating them "to growth or accretion in value." In support petitioners cite *Eisner v. Macomber*, 252 U.S. 189 (1920), and argue that pro rata stock dividends (that is, the distribution of additional shares to existing shareholders in proportion to their respective interests) generally are not taxable income upon receipt.

Crucial to the Court's conclusion in *Macomber* was that "stock dividend[s] really take nothing from the property of the corporation and add nothing to that of the shareholder." *Id.* at 212. That is, the stock dividend at issue in *Macomber* created no increase or shift in the value owned; it merely increased the total number of outstanding shares. "[I]t [did] not alter the preëxisting proportionate interest of any stockholder or increase the intrinsic value of his holding . . . ." *Id.* at 211.

Unlike the stock dividend in *Macomber*, the staking rewards Mr. Paschall received increased his proportion of all outstanding Cardano tokens. The fact that eToro automatically staked Cardano tokens is immaterial; this is a feature of the eToro platform, not the underlying asset. And critically Mr. Paschall could opt out of the staking service.

Token holders did not automatically receive staking rewards in proportion to their ownership. They had to stake their tokens and risk potential forfeiture. Petitioners do not suggest that all Cardano token holders staked their tokens, or that all stakers received rewards in equal proportion to their respective interests. To the extent Cardano was traded on other digital asset platforms, which the record suggests, it is possible that other platforms took different approaches to staking.[7] We also infer from the record and our high-level cryptocurrency background

---

[7] We observe that this is one of several areas where the lack of expert testimony hampers our analysis.

**[\*9]** that Cardano tokens held in unhosted wallets might not be staked and therefore would not receive staking rewards.

Staking rewards increased the overall value of Mr. Paschall's interest in Cardano. The tokens rewarded for staking were indistinguishable from those staked, and all could be converted to cash at any time. The parties stipulated that the value was $33,354.27. Petitioners have not argued that the per-token value of Cardano declined in proportion to the staking rewards received (thus resulting in no real change in value).

Analogizing to *Macomber*, petitioners ask us to take judicial notice of Cardano's finite pool of 45 billion tokens, including staking rewards. Petitioners also suggest that the fixed supply of Cardano tokens is a "non-inflationary system" and that "rewards are redistributed from a fixed supply."

Accepting this as fact would not change our conclusion, nor do we agree with their characterization of Cardano's mechanics. As highlighted above, the distribution of staking rewards from a fixed supply increased both the proportion and the value of Mr. Paschall's interest in Cardano. Nor do we see any indication that staking rewards were "redistributed from a fixed supply."[8] Only a portion of the overall supply was in circulation already; the remainder was held in reserve for future staking rewards. The distribution of staking rewards thus increased the supply and aggregate value of Cardano in circulation.

C.    *Self-created property*

Petitioners also theorize that the staking rewards constitute self-created property. They contend that "tokens created through staking are like a baker's cake or a writer's book—products of labor and capital that yield income only upon sale."[9]

---

[8] Again this is an area where the absence of expert testimony limits our analysis.

[9] Petitioners cite *Jarrett v. United States*, No. 21-cv-00419, 2022 WL 4793235 (M.D. Tenn. Sep. 30, 2022), *aff'd*, 79 F.4th 675 (6th Cir. 2023), in support of this proposition and others. While the taxpayers in that case made similar arguments and the government subsequently conceded that the taxpayers were entitled to a refund, the Court never addressed the merits of the taxpayers' arguments. Further, the government's concession that the taxpayers in *Jarrett* were entitled to a refund is not binding here.

**[\*10]** Their analogy is misplaced. Stakers do not create anything by themselves. Instead, the staked tokens validate transactions on the blockchain. In exchange for validation, the cryptocurrency's protocol grants stakers additional tokens. The fact that these tokens may be newly created is immaterial because the stakers are not the ones who created them. Further, petitioners were not owners or operators of a staking pool; unlike the baker or writer, they lacked the power to decide whether (and when) the property was created.

### D.   *Revenue Ruling 2023-14*

Citing *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), petitioners contend that Revenue Ruling 2023-14 is "inapplicable" and that any reliance on it is misplaced. They also argue that guidance issued in 2023 cannot apply to them retroactively in tax year 2021.

We need not address petitioners' arguments because neither respondent's arguments[10] nor our conclusion rest upon Revenue Ruling 2023-14. *See Stromme v. Commissioner*, 138 T.C. 213, 218 n.8 (2012) ("For now, the better course is 'to observe the wise limitations on our function and to confine ourselves to deciding only what is necessary to the disposition of the immediate case.'" (quoting *Whitehouse v. Ill. Cent. R.R. Co.*, 349 U.S. 366, 372–73 (1955))). Rather, section 61 and related caselaw doom their position.

We have considered all arguments made and, to the extent not addressed above, conclude that they are moot, irrelevant, or without merit.

Because of concessions,

*Decision will be entered under Rule 155.*

---

[10] Respondent addresses petitioners' arguments in his Answering Brief but notes that he "does not directly rely upon [Revenue Ruling 2023-14] to support his position."